IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

DONALD W., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.D., *Appellees.*

No. 1 CA-JV 18-0322
FILED 5-21-2019

---

Appeal from the Superior Court in Maricopa County
No. JD20444

The Honorable Karen A. Mullins, Judge
The Honorable Jacki Ireland, Judge *Pro Tempore*
The Honorable William Brotherton, Judge (retired)
The Honorable Joan A. Sinclair, Judge

**VACATED AND REMANDED**

---

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee*

---

**OPINION**

---

Presiding Judge Paul J. McMurdie delivered the opinion of the Court, in which Judge Randall M. Howe and Judge Jennifer B. Campbell joined.

---

**M c M U R D I E**, Judge:

**¶1**       The issue before the court is whether sufficient evidence supports the termination of parental rights based on fifteen months' time-in-care. We hold that a termination based on fifteen-months' out-of-home placement requires the court to consider the totality of the circumstances throughout the dependency when determining whether the Department of Child Safety ("DCS") made a diligent effort to provide appropriate reunification services, including whether DCS's failure to act reasonably and diligently contributed to the circumstances causing the child to remain in out-of-home placement. We further hold that a request through the Interstate Compact on the Placement of Children ("ICPC") is not required when the evidence does not support a dependency concerning the out-of-state parent. Given the absence of evidence in this case, we vacate the termination judgment.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**       Donald W. ("Father") met Q'Nique T. ("Mother") in Sacramento, California, where they lived together for a short time. After discovering she was pregnant, Mother moved to Arizona. Given the brevity of the relationship, Father was unsure if he was the biological father of Mother's unborn child. He told Mother that if he was the child's father, he wanted to parent the child. Father maintained contact with Mother until October 2014. Father later discovered that Mother had married someone else around the time she stopped communicating with him.

**¶3**       Mother gave birth to Melody in Arizona on December 5, 2014. DCS took custody of Melody from the hospital the next day and placed her in foster care.[1] DCS filed a dependency petition regarding Melody naming

---

[1]      Mother's parental rights to Melody were terminated, and she is not a party to this appeal. DCS removed Melody from Mother's care because she had previously failed to protect another child from abuse.

Mother, her husband, and a John Doe.

**¶4**        On January 2, 2015, Mother reached out to Father for the first time since October 2014 and told him that her husband was Melody's father. Skeptical, Father called Mother's husband, who informed him Melody was in DCS's custody. On January 3, 2015, Father called the assigned DCS case manager, Lucero Garcia, explaining that he believed he was Melody's father and requested a paternity test. The case manager told him that the judge would have to award him a paternity test.

**The Dependency Action**

**¶5**        DCS amended the dependency petition to include Father. After alleging that Father was not married to Mother and had not established paternity, the amended petition read:

>        5.        Father is unable to parent due to neglect. Father is unable to provide his child with the basic necessities of life, including, food, clothing, shelter and support.
>
>        6.        Father has abandoned his child. Father has failed to maintain a normal parental relationship without just cause. Father has failed to send cards, gifts, letters or child support since the child's birth.

The case manager signed the verification, swearing to the veracity of the petition's contents. In the amended petition, DCS requested the court issue a judgment of paternity, but it only included Mother's assertion that her husband was Melody's father and did not mention that Father had contacted DCS believing he was Melody's father.

**¶6**        On March 9, 2015, the court held Father's initial dependency hearing, where he denied the unfitness allegations in the petition. At the hearing, the court ordered DCS to conduct a paternity test and scheduled a dependency hearing for May. The results of the paternity test, dated April 15, 2015, confirmed Father was Melody's father. Immediately following receipt of the test results, Father, to show the court that he cared about his child and wanted custody of Melody, enrolled in a thirteen-week parenting class, which he completed in August 2015.

**¶7**        Although the child had been in DCS custody from birth, after the dependency hearing the court found "[Melody] is dependent as to

[Father] based on inability to parent due to neglect and abandonment." The court set the case plan as "family reunification concurrent with severance and adoption." DCS stated that once Father was on the birth certificate, it would submit an ICPC.[2] On May 27, 2015, DCS filed its notice of lodging the order of paternity, which the court issued two weeks later. By this time, Melody was seven months old.

¶8        Sometime in the summer of 2015, DCS initiated an ICPC with California. In November 2015, the court held a review hearing, where it addressed the pending ICPC, directed DCS to provide a written transition plan to move Melody to California with Father, and found Melody continued to be dependent. The ICPC report, dated December 2015, was favorable to placement with Father. The ICPC social worker in California interviewed Father in his home, then separately interviewed his ex-wife, children, and a friend. The report noted that Father's ex-wife stated: "[he] was a good father, who cares and provides for his children." After interviewing Father's children at their school, the social worker further noted that "[i]t is obvious that [the children] feel loved and cared for by their father and that he is very involved in their lives." The ICPC concluded:

> [Father] had good references and all stated that [he] is an excellent parent to his children. From observation it appears that he has a positive relationship with his children and they look to him for attention and affection. [Father] was the non

---

[2]        The purpose and policy of the Interstate Compact on the Placement of Children is to create a system by which states "cooperate with each other in the interstate placement of children." A.R.S. § 8-548; ICPC Regulation 2(5)(d), 7(6)(a) (the receiving state conducts an investigation of the proposed placement, including a background check and home study and renders a placement decision).The Association of Administrators of the Interstate Compact on the Placement of Children ("AAICPC") is comprised of a Compact Administrator from each state and is authorized by Article VII of the ICPC to promulgate regulations ("ICPC Regulation"). A.R.S. § 8-548, art. VII. The American Public Human Services Agency ("APHSA") acts as the AAICPC's Secretariat and administers the ICPC. The ICPC Regulations cited throughout can be found at https://aphsa.org/OE/AAICPC/ICPC_Regulations.aspx.        Although Arizona has codified some ICPC Regulations, "[the Arizona] regulations supplement those authorities and must be read in conjunction with them." Ariz. Admin. Code ("A.A.C.") R21-5-102.

offending parent and has been diligent in seeking custody from the court in Arizona.

\* \* \*

Placement of the child, [Melody], with [Father], is approved. Please send a [Form] 100(B), confirming the ICPC placement of the child with the father. Please include any additional requests for services from Sacramento County, including courtesy supervision.

¶9 Early in the dependency, Father asked DCS for the foster placement's contact information because he wanted to check on Melody. DCS refused and did not allow Father to have contact with the foster mother until Melody was almost one year old. DCS then gave Father the foster mother's email address, and the two began communicating weekly with updates and exchanging pictures of Melody. In January 2016, DCS finally allowed Father to have contact with Melody, and he began sending "Glide videos."[3] Father recorded and sent the video messages to the foster mother's phone. She showed the videos to Melody and recorded messages from Melody to send back to Father. Father and the foster mother established a routine of exchanging Glide videos several times a day, which they continued throughout the dependency proceedings.

¶10 Although California sent DCS the ICPC approval letter in December 2015, during the February 2016 review hearing, the case manager stated incorrectly that the ICPC had only been "verbally approved." Again, the juvenile court found Melody continued to be dependent. Father attended the February 2016 hearing and anticipated visiting Melody for the first time in person while in Arizona. Because DCS failed to communicate with Father regarding a visit before the hearing, no visit was scheduled. However, Father was able to see Melody for one hour at a fast-food restaurant with the foster mother.

---

[3] Glide is an instant video messaging platform for mobile devices. The app enables a user to send a brief video clip, up to five minutes, in a similar manner as sending a text message. Recipients can watch and respond to the video instantly or later. *Glide (software)*, Wikipedia, https://en.wikipedia.org/wiki/Glide_(software) (last visited May 16, 2019).

¶11          In April 2016, the case manager finally emailed Father a transition plan:

> Just to reiterate our conversation from today. You will try to come out twice a month if possible to Arizona to visit Melody as much as you can. You will also begin calling Melody every Monday, Wednesday, Fridays [sic] and Sunday at 630pm. The phone call should be about 5–10 minutes. This way Melody gets to know your voice and also recognize it. Lastly, you will notify me at least two weeks in advance when you plan to visit Melody so that I can submit a case aide request.

Father began calling Melody as directed. In addition, he continued to exchange the Glide videos, and he rented a car and drove his mother, father, and son to Arizona for a weekend visit to meet Melody. In the June 2016 DCS Report, while still reporting that "[Father] will need to be further assessed to determine appropriate services," the case manager stated:

> [I have] attempted to coordinate with [Father] to set up a transition plan for [Melody] to be moved into his care, however he has failed to follow through with the transition plan. [DCS] no longer believes that it is in the child's best interest to place her in the care of his [sic] father as he does not appear to be committed in the reunification process.

¶12          On July 12, 2016, DCS moved to terminate Father's rights based on abandonment and fifteen months' time-in-care. At the time of the motion, Melody was 19 months old, and DCS was still making efforts to locate an adoptive placement. Despite DCS moving for termination, Father continued to visit Melody when he was financially able and consistently communicated with her through Glide videos.

¶13          When reviewing the case plan in September 2016, the Foster Care Review Board expressed its concern with the case manager's lack of communication. It reported that she was not present for the review; attempts to contact the case manager and her supervisor were unsuccessful; and she failed to provide a current case plan document for review. The Board determined "there are significant service gaps or system problems" and it was "unable to conduct a thorough review" because it had "inadequate information."

¶14          By October 2016, DCS closed the ICPC because there had "not been any progress made toward transitioning Melody to [Father]." The October 2016 DCS Report stated that because Father had only visited

Melody twice, he "[did] not appear to be interested in reunifying with his daughter." In April 2017, when Melody was two and a half years old, the juvenile court ordered Father to complete a Bonding/Best Interest Evaluation ("Bonding Assessment"), which was conducted by Dr. Mary Oakley on June 6, 2017.

**July 2017 Termination Hearing**

¶15        The court heard evidence on DCS's termination motion in July 2017 ("2017 Hearing"). At the hearing, the case manager testified that DCS wanted once-a-month visits at first, then intended to increase the number of required visits before reunification even though Father "had indicated that he had money issues, financially, and he wasn't able to complete" once-a-month visitation.

¶16        At the hearing, the case manager was asked why DCS had not sent Melody to California to visit Father. She stated: "Because we just can't send the child out there. We know—that's not the process. We normally increase contact with the parents." The court questioned whether DCS had a program to offer financial assistance to out-of-state parents. The case manager responded: "Not that I know of, no." When asked if DCS could have moved Melody into a California placement to be closer to Father, she responded: "I don't believe so."

¶17        After hearing the evidence, the court stated:

> I'm sad to hear that this case has been going on for all this period of time . . . . But I don't think . . . if you're [in] a long-distance situation, [and] you could only afford to come once a month or once every two months, [too] bad, we're going to sever your child from you. I don't think that was what was intended [under the time-in-care statute].

The court concluded it could not "sever rights, because people are poor" and denied DCS's motion for termination. The court then ordered DCS to (1) "staff with the unit psychologist regarding all factors in this matter including father's financial status to develop a transition plan"; (2) provide transportation for Father's visits, including airfare and transportation to and from the airport and the visitation center to see Melody; and (3) have the visits occur once a month, pending the opinion of the unit psychologist and the transition plan.

¶18        DCS objected to paying for Father's airfare, stating it "is the most expensive way" and that DCS does not have "unlimited resources."

7

However, the court determined, "as [the case manager] stated, it's a long drive from Sacramento," and flying was the most reasonable option. The court held that the "option needs to at least be tried" because "I cannot, in good conscience, say . . . you're too poor, so we're going to sever you."

¶19 DCS booked and paid for Father's visit in September 2017, which he attended. But DCS failed to produce the court-ordered transition plan. The October 2017 DCS Report stated:

> [The case manager] has also consulted with the unit consultant to come up with a transition plan to transition [Melody] into father's care, however the unit psychologist indicated that this needed to be done with the assigned evaluator that completed the [Bonding Assessment] as she had more knowledge as to the relationship between the father and child.

Before Father's October 2017 visit, the court held a review hearing and ordered Father to increase his visits to weekly, six hours on Saturday and six hours on Sunday. DCS again objected to purchasing Father's airfare, and the court modified the order to allow DCS to reimburse Father upon arrival. Accordingly, Father purchased the airfare for the last weekend of October 2017 and the first weekend in November 2017.

¶20 When Father arrived for his October visit, DCS did not immediately reimburse him as the court ordered it to do. Instead, on November 1, 2017, DCS moved to modify the court's order, this time requesting permission to reimburse Father within three weeks of receiving his claim to allow for approval and processing. Father arrived for his November 6, 2017 visit before the court ruled on DCS's motion. Again, DCS did not reimburse Father on arrival. On November 21, 2017, the court granted DCS's motion, vacated the October order, and ordered DCS to reimburse Father "for his travel expenses up to three weeks after [DCS] receives a receipt for the purchase of travel."

¶21 DCS failed to reimburse Father within the three weeks per the court order. Because of the out-of-pocket expense and reimbursement delay, Father was no longer able to afford to travel to Arizona for the weekly visits, and he canceled the visits scheduled for the remainder of November. In the DCS Report dated January 26, 2018, the case manager acknowledged that "[Father] also reported that he was waiting to get the flight refunds from DCS so that he could book another flight." She testified that she did not know how long it took for Father to receive reimbursement

checks, and there had been a "lack of communication" that caused "an issue." In February 2018, DCS again moved to terminate the parent-child relationship based on fifteen months' out-of-home placement. By then, Melody was a little over three years old.

**July 2018 Termination Hearing**

¶22 The juvenile court held a second termination trial in July 2018 ("2018 Hearing"). The termination motion cited Father's "unstable employment," which it stated "ha[d] been a frequent problem since the beginning of this case," that Father "ha[d] been unable to demonstrate an ability to parent the child," and that "Father ha[d] failed to establish and maintain a normal parental relationship with his child."

¶23 The court found that Father's "substantial failure to engage in visitation" was the circumstance that was currently causing Melody to remain in out-of-home placement, and that, despite DCS's reimbursement of Father's travel expenses, he had not been able to remedy the circumstance. The court additionally found that termination was in Melody's best interests, and granted DCS's motion to terminate the parent-child relationship. Melody was three and a half years old.

¶24 Father timely appealed, and we have jurisdiction under A.R.S. § 8-235(A) and Arizona Rule of Procedure for the Juvenile Court 103(A).

**DISCUSSION**

¶25 The juvenile court terminated the parent-child relationship under A.R.S. § 8-533(B)(8)(c), which requires DCS to establish by clear and convincing evidence that: (1) Melody had been in court-ordered out-of-home placement for at least fifteen months; (2) DCS made a "diligent effort to provide appropriate reunification services"; but despite that effort, (3) Father had been unable to remedy the circumstance causing Melody to be in court-ordered out-of-home care; and (4) there was "a substantial likelihood that [Father would] not be capable of exercising proper and effective parental care and control in the near future." *See Roberto F. v. ADES,* 232 Ariz. 45, 56, ¶ 51 (App. 2013); *Jordan C. v. ADES,* 223 Ariz. 86, 93, ¶ 17 (App. 2009). "When the statutory grounds for termination are challenged, we will affirm a termination order unless we must say as a matter of law that no one could reasonably find the evidence supporting statutory grounds for termination to be clear and convincing." *Jordan C.,* 223 Ariz. at 93, ¶ 18 (quotation omitted).

¶26        Here, the court erred by failing to consider the totality of the circumstances surrounding Melody's time in care. Because the court did not identify the "circumstance" causing the out-of-home placement, *both the origin and any cause arising during the dependency*, the court was unable to properly conclude that: DCS had made a diligent effort to provide appropriate reunification services ("diligent efforts"); Father was unable to remedy the circumstance; and Father was unlikely to be able to parent effectively in the near future. After reviewing Father's and DCS's actions throughout the three and a half years Melody was in DCS's custody, we hold that no one could reasonably find the evidence supporting the statutory grounds for termination to be clear and convincing.

A.     **The Court-Ordered Out-of-Home Placement Was Based on a Factually Deficient Dependency Petition and Insufficient Evidence.**

¶27        The first issue that must be reviewed under A.R.S. § 8-533(B)(8) is the "circumstance" causing out-of-home placement. Because the substantive statutory grounds are "synonymous with unfitness," as "[t]hey address the most serious instances of parental abuse, neglect, or incapacity," the reason causing out-of-home placement must be one that indicates parental unfitness. *Alma S. v. DCS*, 245 Ariz. 146, 150, ¶¶ 9–10 (2018). The juvenile court has the authority to place a *dependent* child in out-of-home care only if placing the child "with the child's parents is contrary to the child's welfare." A.R.S. § 8-845(A). A dependent child is defined by A.R.S. § 8-201(15). Generally, a dependent child lacks a parent willing and able to exercise proper and effective parental care and control, or in other words, lacks a fit parent. A.R.S. § 8-201(15)(a)(i). Nothing in the record supports a finding that Melody is, or has ever been, dependent as to Father.

1.     **The Court Ordered Out-of-Home Placement Was Based on a Factually Deficient and Unsupportable Petition.**

¶28        Relating to Father, the primary cause of Melody's out-of-home care was the court's dependency finding in May 2015. At that time, no evidence showed that Father was an unfit parent, or that living with Father was contrary to Melody's welfare. Melody had been in DCS's custody since birth. Father contacted DCS when Melody was less than one month old. Nevertheless, without *any* investigation, DCS filed a petition alleging that Melody was dependent due to abuse or neglect as to Father. DCS claimed that "Father is unable to parent due to neglect. Father is unable to provide his child with the basic necessities of life, including, food,

clothing, shelter and support," and "Father has abandoned his child. Father has failed to maintain a normal parental relationship without just cause. Father has failed to send cards, gifts, letters or child support since the child's birth." The petition did not state any facts supporting these conclusions. *See* A.R.S. § 8-841(B)(3) (the dependency petition must include "[a] concise statement of the facts to support the conclusion that the child is dependent").

¶29        Under A.R.S. § 8-201(25)(a), "neglect" is defined as

> [t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare[.]

And under A.R.S. § 8-201(1), "abandoned" means

> the failure of the parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandoned includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

*See also Pima County Juv. Action No. S-114487*, 179 Ariz. 86, 96 (1994) ("What constitutes reasonable support, regular contact, and normal supervision varies from case to case. It is often difficult . . . for the unwed father to provide support or supervision, or to even maintain contact. Nonetheless, the father must take concrete steps to establish the legal or emotional bonds linking parent and child."). The petition's generic assertions failed to support the conclusion that an out-of-state parent—seeking to establish paternity of a less than one-month-old child, who has been in DCS custody since birth—abused, neglected, or abandoned the child. *See* A.R.S. § 8-841(B)(3) (the dependency petition must include "[a] concise statement of the facts to support the conclusion that the child is dependent").

¶30        Moreover, the record is devoid of *any* evidence supporting the unfitness allegations in the petition, a fact DCS acknowledged at oral argument before this court. Mother had lived with Father in Sacramento, where the couple conceived Melody. Mother decided to move to Arizona. Even so, Father proactively maintained contact with Mother and told her he wanted to be involved in parenting the child. Mother ended the

communication with Father once she married. Despite Mother's deception in telling Father that he was not Melody's father, he called Mother's husband, found out Melody was in DCS's care, and immediately contacted DCS requesting a paternity test. The case manager told Father to contact the juvenile court, which he did. Father diligently complied with the ordered paternity test, appeared for the hearings, participated in parenting classes, and contested the allegations in the dependency petition. No evidence supported a dependency finding that Father failed to take concrete steps to establish a legal and emotional bond with Melody, or that Father neglected or abused Melody. Thus, DCS lacked a factual basis to allege that Melody was a dependent child.[4]

### 2. The Court Ordered Out-of-Home Placement Was Based on an Unsupported Dependency Finding.

**¶31**        Notwithstanding the baseless dependency petition, the juvenile court had an independent obligation to make findings "based upon the record and evidence presented" to "[d]etermine whether a factual basis exists to support a finding of dependency." Ariz. R.P. Juv. Ct. 55(D)(1)(c) (court must determine whether a factual basis exists even when the parent admits or does not contest); Ariz. R.P. Juv. Ct. 55(D)(2) (the petitioner must satisfy the burden of proof based upon the record and present evidence even when the parent fails to appear); *see also Pima County Juv. Action No. 86192*, 151 Ariz. 359, 361 (App. 1986) (an allegation contained in the dependency petition is not itself evidence; Rule 55 "implies without question that evidence from which the court may make findings must be presented").

---

[4]        The lack of factual support for the allegations in the petition relating to Father's unfitness creates significant concerns about the ethical propriety of filing the dependency petition claiming Father abused or neglected and abandoned Melody. *See* Ariz. R. Sup. Ct. 42, ER 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ."); Ariz. R. Sup. Ct. 42, ER 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a good faith basis in law and fact for doing so that is not frivolous . . . ."); *In re Alexander*, 232 Ariz. 1, 5–7, ¶¶ 12–21 (2013) (ER 3.1 requires an attorney to be sufficiently informed "about the applicable facts and law to make good faith and nonfrivolous arguments" when filing and maintaining an action).

**¶32**          If the juvenile court does not find by a preponderance of the evidence that the allegations contained in the petition are true, "the court shall dismiss the petition" and must "return the child to the parent." A.R.S. § 8-844(C)(2); Ariz. R.P. Juv. Ct. 55(E)(2). On the other hand, if the court determines the petitioner has met its burden, the court is required to "[s]et forth specific findings of fact in support of" the dependency finding in the form of a signed order or minute entry. Ariz. R.P. Juv. Ct. 55(E)(3).

**¶33**          The juvenile court held the contested dependency hearing in May 2015. Father "den[ied] the allegations in the petition, but submit[ted] the issue of dependency to the Court for determination." The court admitted a DCS Report dated April 21, 2015, into evidence. The court considered "the information in [the DCS Report] as well as the allegations in the petition," and concluded:

> first of all, the allegations of the petition [are] true by a preponderance of the evidence. This child is dependent as to [Father], based on inability to parent due to neglect and abandonment.

The *only* information in the report relevant to Father was that "[the paternity test] determined that [Father] cannot be excluded as the biological father of [Melody]. [Father] reports that he wants his child to be placed in his care and an ICPC will soon be submitted for him" "to determine if he is able to care for [Melody]." The report noted that "[Father] will need to be further assessed to determine appropriate services."

**¶34**          Nothing in the April 2015 DCS Report supported DCS's allegations against Father of abuse, neglect, or abandonment, nor did it establish that Melody lacked a parent who was willing or able to exercise proper and effective care and control. Instead, the April 2015 DCS Report demonstrated that Father was Melody's parent, he wanted custody of her, and DCS lacked any knowledge to support its contention that Father could not care for Melody. Father's attorney did not appeal the dependency order, and the erroneous dependency finding was not recognized throughout the subsequent hearings. Nor was this complete lack of evidence considered—more than three years later—at the termination hearing.

### 3.          The Court Erred By Continuing Out-of-Home Care to Allow DCS Time to Investigate Father's Fitness to Parent.

**¶35**          The court's dependency finding enabled DCS to extend Melody's time in out-of-home care to investigate whether she was

dependent. But DCS's lack of knowledge concerning Father's fitness is not a basis to keep a child in out-of-home placement.

¶36        Father has an "inalienable right" to parent his child "without obstruction or interference from this state," A.R.S. § 1-602(A), (D); *see also Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005) ("Parents possess a fundamental liberty interest in the care, custody, and management of their children." (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982))). DCS has not provided—nor have we found—statutory authority permitting DCS to withhold custody of a child from its parent while DCS investigates the parent without *some* evidence of unfitness. *See Ariz. State Dep't of Pub. Welfare v. Barlow*, 80 Ariz. 249, 252 (1956) ("Because the child has attained a favored, beneficent status in our social and legal systems does not detract from the well-settled rule that the right of parents to the custody of minor children is both a natural and a legal right.").

¶37        The court made the dependency finding and allowed DCS to initiate an ICPC. Father's attorney did not appeal whether the ICPC was appropriate under these circumstances. Therefore, we assume without deciding that the court properly allowed the ICPC. However, because of the delay it caused, and because DCS continues to argue both in its briefing and in oral argument that "DCS cannot place [Melody] out of state without an approved ICPC evaluation," we find it necessary to address the applicability of an ICPC with an out-of-state parent.

### 4. The Lack of an ICPC Cannot be the Cause for Maintaining a Child in DCS Care; Rather it Has to be Based on Parental Unfitness Found by a Court.

¶38        An ICPC is not required when evidence does not support a dependency as to the out-of-state parent. *See In re Emoni W.*, 48 A.3d 1, 6 (Conn. 2012) (ICPC does not apply to out-of-state non-custodial parent); *accord In re C.B.*, 116 Cal. Rptr. 3d 294, 302 (Cal. Ct. App. 2010); *In re Alexis O.*, 959 A.2d 176, 182 (N.H. 2008). An ICPC is intended for out-of-state *placement* of a *dependent* child. A.R.S. § 8-548, art. II(d) ("'Placement' means the arrangement for the care of a child in a family free or boarding home or in a child-caring agency . . . ."); A.R.S. § 8-548, art. III(a) ("No sending agency shall send, bring, or cause to be sent or brought into any other party state any child *for placement in foster care or as a preliminary to a possible adoption* [without complying with the ICPC]." (emphasis added)).

¶39        Previously, this court held in *ADES v. Leonardo* that "[i]t is not contrary to the description of 'placement' . . . to find that the description

includes placement of a child who is the subject of a protective action and in the legal custody of the state in a home with an out-of-state parent whose rights have been 'diminished or severed by the action or order of any Court.'" 200 Ariz. 74, 80, ¶ 17 (App. 2001) (quoting ICPC Regulation 3(3) (2001)). The court applied the requirement of the ICPC to a nonoffending parent who did not have "full custodial rights" after a dissolution preceding. In doing so, the court reasoned that, although not having full custodial rights did not make a parent presumably unfit, "he or she must be investigated to ensure that the child would be safe if placed with that parent." *Id.* at 81, ¶ 20.

**¶40** However, *Leonardo* failed to identify authority allowing for continued state custody of a child in the absence of evidence that an out-of-state parent is unfit. *See Barlow*, 80 Ariz. at 252 ("The best of intentions and the greatest zeal to care for neglected, dependent, or delinquent children do not justify the violation of the constitutional provisions as to due process that are involved in removing a child from the custody of its parent." (quoting *In re Godden*, 63 N.W.2d 151, 156 (Neb. 1954))). Moreover, ICPC evaluations are based on subjective criteria, unlike dependency and termination, and if the regulations are read too broadly, the denial of an ICPC could effectively terminate the relationship between a child and a fit parent.

> [A]gency caseworkers have the power to effectively terminate the parent's relationship with the child by finding that the placement would be contrary to the child's interest, a wholly subjective standard. The ICPC denies courts the ability to make the ultimate decision, and the parent is not given an adequate opportunity to appeal the caseworker's determination in either an administrative or judicial proceeding.

Vivek S. Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 Yale L. & Pol'y Rev. 63, 80 (2006). Because of the parent's fundamental right to parent his or her child, the use of an ICPC to deny a parent custody of a child must constitute a "fundamentally fair procedure." *See Santosky*, 455 U.S. at 754–55. Therefore, a court must oversee the ICPC process to ensure the parent's rights are adequately protected.

**¶41** To ameliorate the problem presented in *Leonardo*, the AAICPC amended ICPC Regulation 3 in 2011. *See also In re Emoni W.*, 48 A.3d at 7, n.8 (declining to take a position regarding the propriety of the

court's analysis in *Leonardo*, recognizing that the regulations in effect at the time of the decision had changed). Arizona codified the amended ICPC Regulation 3(b), *see* A.A.C. R21-5-105(B)(3) (effective January 2, 2016), which states:

> [T]he ICPC does not apply . . . [w]hen a sending court or agency seeks an independent (not ICPC related) courtesy check for placement with a parent from whom the child was not removed, the responsibility for credentials and quality of the courtesy check rests directly with the sending court or agency and the person or party in the receiving state who agrees to conduct the courtesy check without invoking the protection of the ICPC home study process. This does not prohibit a sending state from requesting an ICPC.

Thus, when DCS discovers that a child in its care has an out-of-state parent, the regulation allows it—in addition to the conventional mechanisms it employs to investigate a parent—to request a courtesy check from the parent's home state. *Accord In re Emoni W.*, 48 A.3d at 11 (an agency can investigate an out-of-state parent without an ICPC). The ability to request a courtesy check, however, does not authorize DCS to hold a child in its care for an indeterminant amount of time simply because it lacks an ICPC approval. Unless DCS has a reasonable basis for believing the out-of-state parent is unfit, it *must* turn over the child to the parent.

¶42            If sufficient evidence supports a dependency concerning the out-of-state parent, the regulation does not prevent the court from ordering an ICPC, or a priority placement ICPC, when appropriate. *See* ICPC Regulation 7 ("The intent of [Regulation 7] is to expedite ICPC approval or denial by a receiving state for the placement of a child with a parent, . . . and to . . . [h]elp protect the safety of children while minimizing the potential trauma to children caused by interim or multiple placements while ICPC approval to place with a parent or relative is being sought through a more comprehensive home study process."). A denied ICPC alone does not preclude a parent from gaining custody of the child. The court must determine if the parent is unfit based on the evidence, which may include the results from a home study or a denied ICPC.

¶43            Here, the juvenile court ordered that DCS initiate a new ICPC in July 2017 after denying DCS's first motion for termination. Without evidence of parental unfitness, however, DCS had no authority to delay moving Melody to Father's care pending out-of-state approval. The results of the subsequent ICPC could not prohibit Father from obtaining custody

of Melody so long as the results did not establish sufficient evidence for the court to find Melody dependent as to Father.

**5.      The Court Erred By Continuing the Dependency, Causing Melody to Remain in Out-of-Home Placement.**

**¶44**      California approved the original ICPC in December 2015. *See* DCS: Policy and Procedure Manual ("DCS Pol'y & Proc."), Referral to ICPC, Ch. 5, § 40 ("If the placement is approved, the DCS Specialist may at that time place the child in the receiving state.").[5] However, by this time DCS was concerned that Melody had been in DCS's care for almost one year. Therefore, it wanted to set up a plan with Father to ensure that Melody transitioned smoothly into Father's care. Although a transition plan may be ideal, DCS's authority is governed by statute. DCS, again, has not provided this court with any authority that allows it to withhold a child from a fit parent until it creates and institutes a transition plan. It is undisputed that in December 2015, Melody had a parent willing and able to provide the necessary care. Thus, at that point, Melody was not dependent, and the court lacked authority to continue Melody's out-of-home dependency for DCS's transition plan.

**B.      DCS Failed to Make a Diligent Effort to Provide Appropriate Services.**

**¶45**      As stated, based on our review of the record, the evidence does not support a cause for Melody to be in DCS care related to Father. Assuming, without deciding, that Father's failure to appeal the original dependency finding could be cause for Melody to be in DCS's care, we must determine whether, at the time of the termination hearing, reasonable evidence supported the juvenile court's finding that despite DCS's diligent efforts, Father had been unable to remedy the circumstances causing Melody to be in court-ordered out-of-home placement. A.R.S. § 8-533(B)(8)(c); *see also Jordan C.*, 223 Ariz. at 96, ¶ 31, n.14.

**¶46**      As the agency responsible for Melody's care, DCS had a constitutional obligation to attempt to unite her with her father. *Jordan C.*, 223 Ariz. at 93, ¶ 19. As DCS recognizes, its duty necessitates that it "make reasonable efforts to preserve the family." *Marina P. v. ADES*, 214 Ariz. 326, 333, ¶ 37 (App. 2007); *see Santosky*, 455 U.S. at 753–54 ("When the State

---

[5]      Citations to DCS's Policy and Procedure Manual can be found at https://extranet.azdcs.gov/DCSPolicy/.

moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."). A "reasonable effort" requires DCS "to undertake measures with a reasonable prospect of success." *Mary Ellen C. v. ADES*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

¶47 Unlike DCS's constitutional duty to make reasonable efforts, when moving to terminate a parent-child relationship under one of the time-in-care grounds, DCS must show that its efforts were not only reasonable but also *diligent*. A.R.S. § 8-533(B)(8); *see Mary Ellen C.*, 193 Ariz. at 191, ¶¶ 30–32 (discussing the difference between "reasonable efforts" and "diligent efforts"). Diligence ensures that a parent's liberty interest in raising his or her child, and the desire to correct the circumstances that are causing parental unfitness, is balanced with the effect that the passage of time without stability and permanency has on the child.

¶48 When a parent substantially neglects or willfully refuses diligent efforts, the court may terminate the parent-child relationship at nine months. A.R.S. § 8-533(B)(8)(a); *see also* A.R.S. § 8-533(B)(8)(b) (six-months' time-in-care for a child under three years old). But when the parent tries to preserve the parent-child relationship, the State must additionally prove that "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Until a parent is deemed unfit and unable to correct the problem, it remains in the child's best interests to unite the child with the parent. *See Santosky*, 455 U.S. at 760 ("[T]he child and his parents share a vital interest in preventing erroneous termination of their natural relationship."). This case highlights the importance of such a requirement. The passage of time not only exacerbated the circumstances but also served as the basis the court ultimately found for terminating the parent-child relationship.

¶49 Termination under A.R.S. § 8-533(B)(8)(c) requires the child to be in court-ordered out-of-home placement for a "cumulative" total of fifteen months, and DCS must make diligent efforts for the entire time the case plan is reunification. *Jordan C.*, 223 Ariz. at 96, ¶ 30. But the court must also consider the totality of the circumstances when determining whether DCS has made diligent efforts. Intermittent efforts by DCS cannot be regarded as diligent when they undermine the parent. DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period.

¶50 Although what constitutes a diligent effort will vary by case based on the family's unique circumstances, a diligent effort requires — at

the least—DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances *as they arise throughout the time-in-care period*, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult. *See Jordan C.*, 223 Ariz. at 96, ¶ 30. Diligence on DCS's part ensures the time a child spends in out-of-home placement does not unnecessarily damage the parent-child relationship.

1. **DCS Failed to Offer Appropriate Services to Remedy the Circumstances Causing the Out-of-Home Placement Before Moving for Termination.**

¶51 DCS's lack of diligence at the onset created the circumstance—the absence of a bond—that DCS relied on to maintain Melody in out-of-home placement. DCS then demanded Father remedy the condition by imposing unreasonable requirements on him, which undermined his efforts and needlessly prolonged the dependency.

a. **DCS Contributed to the Circumstances By Conducting an Eight-Month Investigation into Father's Ability to Parent Without Any Evidence of Parental Unfitness.**

¶52 The only circumstance that caused Melody to remain in out-of-home care after Father established legal parentage was DCS's uncertainty concerning Father's fitness. DCS had no evidence that Father was unfit and failed to act before pursuing a dependency to resolve its unfounded concern. *See In re Emoni W.*, 48 A.3d at 11. Rather than making diligent efforts to transition Melody to Father's care, DCS chose to undertake an eight-month investigation into whether Father was fit.

¶53 The April 2015 DCS Report stated that DCS would submit an ICPC. In the May 2015 hearing, the court asked DCS whether the ICPC was underway. DCS said that the ICPC would be sent after Father was placed on Melody's birth certificate. Yet, DCS did not lodge the order of paternity for nearly two months after paternity was presumed—which was four months after Father requested a paternity test. The case manager testified that she "believed" she had submitted the ICPC in the summer of 2015. Because of Melody's age—and because Father is Melody's parent—Father was eligible for a priority placement ICPC, requiring the receiving agency to complete the request within 20 business days. *See* ICPC Regulation 7(9)(e); DCS Pol'y & Proc., Overview of ICPC, Ch. 5, § 39 (DCS may request the court order a priority ICPC when the child is under four years old). DCS

did not request a priority placement ICPC and unnecessarily delayed its investigation of Father.

### b. DCS Failed to Make a Diligent Effort By Instituting a Transition Plan That Had No Likelihood of Success.

¶54 The approved ICPC did not result in immediate unification. The case manager testified at the 2018 Termination Hearing that "[California] wanted us to do a transition process for Melody but that never got completed, so then [the ICPC] ultimately was denied." Without any factual basis, DCS blamed Father's "lack of commitment to Melody," for the unsuccessful unification.

¶55 The record refutes the case manager's claims that the ICPC approval was conditional, or that California ultimately denied it. Other than the ICPC approval letter, DCS had no communication with California. *See* DCS Pol'y & Proc., ICPC Placements, Ch. 5, § 41 (all significant verbal communication with the sending or receiving agency should be documented). The language in the letter was conclusive: "Placement of the child . . . is approved. Please send a [Form ICPC-100(B)], confirming the ICPC placement of [Melody] with [Father]." Once the ICPC is approved, "[i]t is up to the *sending entity* . . . to decide if and when to place the child."[6] The October 2016 DCS Report stated that the "ICPC packet has now been *closed*." (Emphasis added.) DCS's attorney later admitted that California had not denied the 2015 ICPC; instead, DCS allowed it to lapse.

¶56 DCS maintains that the circumstance that caused Melody to remain in out-of-home placement was the perceived lack of a bond between Melody and Father. Because Melody was uneasy around people that she did not know, DCS claimed it "implemented a transition plan that would allow Father to build a relationship with [Melody] in anticipation of her moving to his care." Why DCS required any transition plan after the initial ICPC is unclear. Melody was not in an adoptive placement, and she could

---

[6] *See* APHSA, *ICPC FAQ*, https://aphsa.org/AAICPC/AAICPC/icpc_faq_2.aspx (last visited May 16, 2019) (emphasis added); *see also* ICPC State Pages, *California*, http://icpcstatepages.org/california/homestudies/ (last visited May 16, 2019) (in California, an approved home study is valid for two years).

have been removed from the foster mother's care at any time for a variety of reasons.

¶57　　　　DCS expressed concern that Melody and Father lacked a bond in November 2015—even before the results of the ICPC were known—and before it permitted contact between Father and Melody. In response to DCS's concern, the court directed DCS "to provide a written transition plan of Melody to the father" at that time. Five months later, the case manager finally sent Father an email that DCS refers to as the transition plan. The email suggested—but did not require—Father "try to come out twice a month to Arizona to visit Melody as much as [he] can," and to "begin calling Melody" for 5–10 minutes, four times a week for Melody to "get[] to know [Father's] voice and also recognize it." To support Father in completion of the transition, the case manager testified that DCS also offered supervised visitation if he was able to come to Arizona.

¶58　　　　The in-person visitation plan lacked any prospect of success. Father told the case manager that he would only be able to visit "every four months . . . so [he could] save enough money to actually be able to come out . . . ." and "make sure that [his] bills [were] taken care of." Father testified that DCS told him "that's going to be a problem," but he did not believe there was "any leeway" and understood DCS's position to be "do this or . . . you don't see your daughter." The case manager confirmed that DCS was aware that "he had money issues . . . and he [wouldn't be] able to complete [the plan]."

¶59　　　　However, DCS did not modify the visitation recommendation, work with Father to establish a plan with which Father could comply, or attempt to send Melody to California to visit Father. The case manager testified that she did not try to secure financial assistance for Father's visits, and she was not aware if DCS offered such services. *See In re Riva M.*, 235 Cal. App. 3d 403, 414 (1991) (an effort to assist where compliance proves difficult may include helping to provide transportation). Father did travel to Arizona to visit Melody twice between March and June 2016.

¶60　　　　Although DCS maintains that Father should have engaged in a calling plan to successfully bond with Melody, other than hearing his voice, it is not clear what DCS hoped to accomplish by requiring him to make several phone calls per week with a child who was only one and a half years old. Even at the time of the 2017 Hearing—when Melody was two and a half years old—the case manager testified that "she kind of

babbles on, because she can't really say a lot of words right now" and admitted that phone calls with an infant were "almost of [no] value."

¶61 In the June 2016 DCS Report—within three months of sending the transition-plan email—DCS stated that it "no longer believe[d] that it [was] in the child's best interest to place her in the care of his [sic] father as he does not appear to be committed in the reunification process" and recommended changing the case plan to severance and adoption. In its subsequent termination motion, DCS falsely claimed that "Father ha[d] failed to keep most of the weekly appointments for telephonic contact with the child."

¶62 The foster mother reported that Father missed only five calls of the fifty days on which Father would have been scheduled to call in that period. More importantly, Father was establishing a relationship with Melody in the best way he could under the circumstances. In addition to the scheduled telephone calls, Father and the foster mother—without the assistance of DCS—developed their routine of sending the Glide videos every morning and night to accommodate both of their schedules. Because of the Glide videos, Melody was able to acknowledge Father's face and voice. Melody responded to Father's Glide videos by saying "hi daddy," "babbling," and sending him kisses.

> **2. DCS Failed to Make a Diligent Effort By Failing to Communicate With Father When It Perceived that His Efforts Were Deficient.**

¶63 DCS's plan lacked justification, and the case manager acknowledged that the requirements were "not feasible" for Father, yet DCS failed to help Father comply. Consequently, the plan was guaranteed to increase Melody's time in the out-of-home placement, which strengthened Melody's attachment to the foster mother, and created a circumstance Father could not remedy effectively.

¶64 Although DCS's July 2016 motion for termination alleged that the lack of a bond precluded Father from being able to care for Melody, DCS did not commission Dr. Oakley to perform the Bonding Assessment until immediately before the July 2017 Hearing, almost one year later. By then, Dr. Oakley observed that Melody had a "strong attachment to [the foster mother]," and concluded that, if removed from the foster mother's care, Melody "may incur long-term negative effects." She opined that although "distance [was] why [Father] ha[d] not spent more time with

[Melody]," "the longer [Melody was] out of [Father's] home, the harder it [would] be for her to transition from her home with [the foster mother]."

¶65 Based on Dr. Oakley's assessment, DCS maintained that the lack of a bond—a situation it had effectively created—could be remedied only by frequent in-person visitation. DCS argued that termination was appropriate because "we don't know whether Father is willing to relocate to establish a relationship. And we don't know how long that would take as well." The case manager testified that Glide videos—which Father had been consistently sending daily for over a year and a half—were not interactive like "Skype" and were insufficient for creating and maintaining a "normal parent-child relationship."

¶66 DCS failed to inform Father of the deficiencies it perceived with his compliance with the case plan and did not allow Father to satisfy its requirements. *See Roberto F.*, 232 Ariz. at 56, ¶ 54 ("fault . . . lies with [DCS], not Father" when DCS fails to inform him that his attempt to satisfy the case plan failed or is deficient). Father testified that he used Glide to communicate because Melody was unable to use the phone on her own, and, although he attempted to use other video chat services, the foster mother was familiar only with Glide and Father was limited to what she knew how to use.

¶67 Even if Glide videos were somehow less effective than a "more interactive chat," it was DCS's duty to communicate the purported deficiency to Father and to teach the foster mother how to use alternative methods or arrange for someone to facilitate the type of communication that it would consider acceptable. As it was, without the foster mother's cooperation with Father, it is uncertain whether DCS would have facilitated any contact for Father and Melody. *See Santosky*, 455 U.S. at 763 ("Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.").

## C. The Court Erred By Considering Only DCS's Efforts in the Final Seven Months of the Time-in-Care, and By Finding that Those Efforts Were Diligent.

¶68 By failing to consider the totality of the circumstances of the dependency, the court erroneously found that because "DCS allowed visitation every weekend and paid for his travel from Sacramento to Arizona," DCS made a diligent effort; and "[t]he failure of reunification [was] due to Father's failure to participate, not due to any failure by DCS." The conclusion was erroneous for two reasons. First, the court abused its

discretion by only considering DCS's efforts in the final seven months of the more than three and a half years Melody was in DCS's custody. Second, the evidence does not support the finding.

### 1. The Court Erred By Finding DCS Made Diligent Efforts Because It Failed to Consider DCS's Contribution to the Circumstances Existing at the Time of the Hearing.

¶69 The court's order reflects a finding based solely on the services the court ordered following the 2017 Hearing. However, under A.R.S. § 8-533(B)(8), the court was required to examine not only the final months but the entire dependency.

¶70 From the finding of dependency in May 2015 until June 2016, the case plan was reunification. At that point—just 11 months after the dependency finding—DCS moved to change the plan to severance and adoption. After the July 2017 Hearing, the court reinstituted the reunification plan, but DCS again moved to change the plan to severance and adoption in February 2018. Although the case plan was reunification for a cumulative total of fifteen months, DCS failed to diligently provide appropriate services to remedy the circumstances as DCS believed them to be, and its intermittent efforts only undermined Father's efforts and prolonged the dependency. The juvenile court failed to consider these circumstances.

¶71 Examples of DCS's failure to follow the court's orders are numerous. In July 2017, the court ordered DCS to "staff with the unit psychologist regarding all factors in this matter including father's financial status to develop a transition plan." The October 2017 DCS Report states that the unit psychologist recommended Dr. Oakley prepare the transition plan because she was familiar with Father and Melody's relationship. This result was anticipated and addressed in the 2017 Hearing and the court's order. But the two subsequent DCS Reports prepared before the 2018 Hearing made no mention of a transition plan. Nor did the case manager testify that one was created or in place.

¶72 DCS failed to comply with the court's orders regarding providing Father airfare for his visits. Although Father purchased October and November airfare and sent receipts, DCS refused to reimburse Father for that travel upon his arrival in Arizona. Instead, on November 1, 2017, DCS again moved to modify the juvenile court's order, this time requesting that it be permitted to wait three weeks to reimburse Father to allow for approval and processing. Even after the court modified the order on

November 21, 2017—based on the timeline and procedure DCS outlined in its motion—DCS failed to reimburse Father for the visits consistent with the court order.

¶73 The case manager testified that when Father sent her the receipt, as he was directed, she forwarded it to the resource liaison who was responsible for getting him to fill out the documentation. The additional documentation was not mentioned in the court's order or DCS's motion. The case manager admitted that because of a lack of communication there was an issue with the reimbursement, and she did not know "exactly how long it [took]" for Father to receive payments. Father, however, testified reimbursement took between three to six months. He testified that he contacted his attorney and DCS to follow up with the payment, which the January 2018 DCS Report confirmed. Nevertheless, in February 2018, DCS again moved to terminate the parent-child relationship citing *Father's failure* to visit.

### 2. The Court Erred By Finding that Father's Failure to Visit More Frequently Indicated He Lacked Parental Fitness.

¶74 Under A.R.S § 8-533(B)(8)(c), the court found that "the circumstance[] existing now that ha[s] caused the Child to be in an out-of-home placement [is] Father's substantial failure to engage in visitation." The court supported its order for termination by finding that DCS's visitation requirement was reasonable considering Dr. Oakley's conclusion that Melody was strongly bonded to the foster mother. The court then found that Father had failed to remedy the bonding problem and would be unable to do so in the near future because (1) Father's visits had decreased since the Bonding Assessment; and (2) Father's reason "to justify his failure to visit the Child more frequently was financial," but his "reason lack[ed] credibility given that DCS reimburse[d] Father for his transportation costs." The record does not support the court's two findings regarding Father's alleged shortcomings.

¶75 First, Father's visits did not decrease after the Bonding Assessment. Neither side disputes that Father made more visits in the eight months following the Bonding Assessment than he did in the first two and a half years of Melody's life.

¶76 Second, DCS failed to provide evidence establishing timely reimbursement of Father's travel costs. At the end of the hearing, the court requested reimbursement records because, it "was not really addressed in DCS's testimony, and [the court] ha[d] no record of reimbursements and

whether they occurred when he arrived." DCS's attorney apologized for not producing reimbursement records and stated that the "case manager testified that the reimbursements were made." However, the case manager did not testify that the reimbursements were made. Of the four documented flights that Father made after the July 2017 court order, the case manager testified that DCS provided "one or two of those flights." Regarding the remaining flights that Father purchased, she could testify only to what the court ordered, which was for DCS to reimburse within three weeks. She specifically testified that she did not know how long it took to reimburse Father. Father testified that "[he] booked those tickets in advance, and [he] didn't get a reimbursement until . . . three to six months later," which is supported by the case manager's testimony that a lack of communication had caused a delay in processing and the January 2018 DCS Report noting Father had not received payment.

¶77          Ultimately, without evidence showing that DCS was reimbursing Father per the court order, Father's reason that he could not continue visiting was not a matter of credibility, just pure mathematics. DCS may not have unlimited resources, but Father's resources are demonstrably more limited. Father's income was approximately $2000 a month, he had $100 in savings, and he was living paycheck to paycheck. When traveling to Arizona, Father was responsible for his hotel, food, and "supplies" for Melody such as snacks and diapers. Had Father completed weekly visits, DCS procedures would have required Father to spend his entire monthly earnings on airfare and then wait for three to six months for reimbursement. Such a process does not consider how Father would be able to maintain his home and care for the other children in his care in California while waiting for the reimbursement.

¶78          The evidence shows, and the case manager admitted, that Father was complying with the court-ordered visitation before the court modified the reimbursement order. Without evidence establishing that DCS was reimbursing Father in a manner that allowed him to travel, the evidence does not support a finding that Father's failure to visit Melody was due to parental unfitness. *See Maricopa County Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) ("The important consideration here is that there are fundamental constitutional rights involved in severance cases. Such constitutional rights can be overridden only by the combined elements of statutorily defined *improper behavior by the parent* and the child's best interests." (emphasis added)).

**D.     The Court Erred By Finding That Father Was Not Able to Exercise Proper Care and Control.**

¶79        Finally, the court was required to find by clear and convincing evidence that "there [was] a substantial likelihood that [Father would] not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Again, the record lacks evidence that Father has *ever* been incapable of parenting Melody.

¶80        The ICPC noted: Father's ex-wife stated "[he] was a good father, who cares and provides for his children"; it was "obvious that [his children] feel loved and cared for by their father and that he is very involved in their lives"; Father's references "all stated that [he] is an excellent parent to his children"; and the ICPC caseworker observed "it appears that he has a positive relationship with his children and they look to him for attention and affection." The case manager testified that "[Melody] does do well during scheduled visits with Father." Dr. Oakley reported that she saw no "obvious risks" with his parenting, Father likely had the skills to be an adequate parent, he appeared to care for Melody, he was appropriate with her, and Father seemed to be bonded to her.

¶81        Moreover, under the circumstances, Father's inability to replicate the foster mother's bond with Melody does not show that he was "not capable of exercising proper and effective parental care and control."

> In any severance proceeding, the material issue facing the court is whether a parent has the ability to properly parent his/her child; it is irrelevant whether a child has a stronger attachment to their foster parents, whether foster parents are more "nurturing," or whether foster parents might be more capable or better parents than a natural parent.

*Roberto F.*, 232 Ariz. at 54, ¶ 42. The severance statute does not permit termination of a parent-child relationship based on the lack of a bond. As previously discussed, any perceived lack of a bond between Melody and Father was not because of Father's lack of effort, but because of DCS's delay, contact restrictions, and substantial failure to try to unify Melody with Father.

## CONCLUSION

**¶82**    Accordingly, because we find a complete absence of evidence in the record to support the juvenile court's findings and conclusions supporting the termination of Father and Melody's parent-child relationship, we vacate the order.

