NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL
RIGHTS AS TO G.M. and I.M.

No. 1 CA-JV 25-0133

FILED 03-13-2026

Appeal from the Superior Court in Maricopa County
No. JD38338
The Honorable Glenn A. Allen, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Tucson
By Laura J. Huff
*Counsel for Appellee Department of Child Safety*

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant Charlie M.*

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the court, in which
Judge Anni Hill Foster and Chief Judge Randall M. Howe joined.

**G A S S**, Judge:

¶1 This appeal arises from the second dependency the Department of Child Safety (DCS) filed against mother and father. DCS dismissed the first and released the children to mother. In this one, the superior court terminated both parents' rights to their 2 children under the 15-months-in-care ground. *See* A.R.S. § 8-533.B.8(c). Mother did not contest the termination and is not a party to this appeal.

¶2 On appeal, father argues "there is no evidence that [DCS] made a 'diligent effort' to provide reunification services for [f]ather, a mandatory component of a 'time-in-care' ground for" termination. To the contrary, the superior court did not err when it found DCS provided father with "an array of reunification services and had those services been successfully completed, reunification likely would have occurred." The court thus affirms.

## FACTUAL AND PROCEDURAL HISTORY

¶3 Because the superior court is in the best position to evaluate the evidence, the testimony, and the credibility of the witnesses, the court will not reweigh the evidence. *In re J.C.*, 259 Ariz. 60, 68 ¶ 34 (App. 2024).

¶4 Father is the biological parent of twins, both born in December 2018. While mother was pregnant with the twins, father was arrested and ultimately pled guilty to possession of narcotic drugs for sale (fentanyl) and was sentenced to 7 years in the Arizona Department of Corrections, Rehabilitation, Reentry. Mother gave birth to the twins while father was incarcerated for that sentence.

### I. DCS filed the first dependency petition before the twins turned 3 years old.

¶5 In September 2021, DCS filed the first dependency petition as to father and mother because it found mother was abusing methamphetamine, was trading food stamps for illegal substances, and was not caring for the children. At that point, father was incarcerated and had no relationship with the twins. DCS offered father paternity testing, which showed he was the father. DCS then agreed to provide father services and also asked him to seek out resources at the Department of Corrections because DCS cannot offer parenting classes, substance abuse treatment, and other services to incarcerated people. Eight months later, DCS voluntarily dismissed the first dependency because of mother's progress.

## II. DCS filed the second dependency petition when the twins were around 4 and a half years old.

**¶6** In June 2023, DCS filed a second dependency petition because mother was abusing substances again, could not provide for the twins' basic needs, engaged in domestic violence with her significant other, and had untreated mental-health issues. Because father was incarcerated for the twins' entire lives, he too remained unable to parent them. The superior court found the twins dependent as to mother and father and adopted a case plan of family reunification.

**¶7** During the second dependency, DCS agreed to provide father with visitation, case management, a meeting with DCS to assess his current situation, and service letters urging him to participate in the services available through the Department of Corrections. To father's credit, while in the Department of Corrections, he participated in some services, completing a cultural diversity course in 2018, Think for a Change in 2019, Recreation and Leisure in 2022 and 2023, and Family Ties in 2023. DCS planned to assess father for further services once he was released.

**¶8** During this time DCS provided father with 2 supervised visits a month with the twins, which the Department of Corrections facilitated. Father's participation in those supervised visits was inconsistent. The reasons for the inconsistency are unknown. Father said he always was available for the visits, saying sometimes the children did not come. And even with the visits he had, father did not engage with the twins to understand what was happening in their lives. For example, father did not know the twins were in first grade during the termination hearing. He thought they were still in preschool.

**¶9** Father's incarceration highlighted other ongoing issues about his ability to parent the twins upon release. He abused methamphetamine while incarcerated. And he had ongoing behavioral and anger issues, accumulating 10 disciplinary infractions, including possession of a weapon, promoting prison contraband, assault, possession of drug paraphernalia, and gang activity. As a result of father's behavior issues, the Department of Corrections placed him in a maximum security facility, which limited his ability to participate in programs and services.

**¶10** Perhaps most telling of father's ongoing issues was his short-lived release from the Department of Corrections in September 2024. He never contacted DCS while he was on release, though he knew he should have. Instead, on the day father was released, he went to the twins'

placement while under the influence of methamphetamine. Because father was intoxicated, the twins' placement did not allow him to visit them and asked him to leave. Within a week, father was back in custody and remained incarcerated through the termination hearing.

### III. The superior court changed the case plan to termination and adoption when the twins were 6 years old.

¶11        In March 2025 during the second dependency, the superior court changed the case plan to termination and adoption, and DCS moved to terminate father's parental rights on the abandonment and 15-month grounds. Five months later, the superior court held a contested termination hearing.

¶12        DCS's case manager testified. She said father never provided for any of the twins' basic needs and never sent the twins any gifts, cards, letters, or photographs. She also said DCS provided father with two monthly placement-supervised virtual visits with the twins until March 2025, and from that time, it provided weekly case-aide supervised virtual visits. She said DCS sent father at least 4 service letters and father had participated in court hearings. Even so, father failed to contact DCS to be assessed for services during his release from incarceration. The case manager also explained DCS's other reunification efforts, including conducting safety meetings and team decision-making meetings over the course of the dependency.

¶13        At no time during the dependency or termination proceedings did father object or raise any issues about the services DCS provided despite having many opportunities to do so, including each of the 10 times the superior court made reasonable effort findings on the record. Father's counsel waived opening statements and in closing arguments did not mention any lack of services. Instead, father's counsel focused on father's wish to have more time to try and explain what happened during father's short release from the Department of Corrections in 2024.

¶14        Following the hearing, the superior court found DCS proved (by clear and convincing evidence) the 15-months-in-care ground as to father and proved (by a preponderance of the evidence) termination of father's rights was in the twins best interests. In that ruling, the superior court found DCS had provided father an "array of reunification services and had those services been successfully completed, reunification likely would have occurred." And the superior court expressly found father "failed to challenge the adequacy of the services provided or offered by [DCS]."

4

¶15 The court has jurisdiction over father's timely appeal under Article VI, Section 9, of the Arizona Constitution, and A.R.S. §§ 8-235.A, 12-120.21.A.1.

## DISCUSSION

¶16 The superior court terminated father's rights under the 15-months-in-care ground. *See* A.R.S. § 8-533.B.8(c). To prevail on that ground, DCS had to prove 4 factors by clear and convincing evidence:

> (1) the child has been in a court-ordered out-of-home placement for a cumulative period of fifteen months or longer,

> (2) [DCS] has made a diligent effort to provide the parent with appropriate reunification services,

> (3) the parent has been unable to remedy the circumstances causing the child to be in an out-of-home placement, and

> (4) the evidence establishes it is substantially likely the parent will be unable to exercise proper and effective parental care and control in the near future.

*In re J.C.*, 259 Ariz. at 68 ¶ 36. Father challenges the superior court's findings on only the second factor: whether DCS made "a diligent effort to provide appropriate reunification services." *Id.* ¶ 39 (quoting A.R.S. § 8-533.B.8); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 190 ¶ 25 (App. 1999). Father does not challenge the superior court's best interests' findings.

## I.    Waiver aside, the court will address the merits of father's appeal.

¶17 DCS argues father waived his argument because he failed to raise it before the adjudication. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 18 (App. 2014) (holding a parent waives concerns about services if the parent does not timely raise them in superior court). Throughout the case, the superior court consistently found DCS made reasonable efforts to finalize the permanency plan. Father never objected to those findings. And father filed no reply brief responding to DCS's waiver argument. In his opening brief, father suggests the court should consider his counsel's cross-examination of the case manager as an objection to DCS's efforts to provide services.

¶18     But the dependency process "demands that parents voice their concerns about services to the juvenile court in a timely manner" to allow that court "a reasonable opportunity to address the matter and ensure" DCS follows its statutory obligation. *Shawanee S.*, 234 Ariz. at 178–79 ¶¶ 16, 18. Here, father's failure to timely object or voice concerns about services deprived the superior court of a reasonable opportunity to address any issues before the adjudication. Even so, because of the important rights at stake in termination proceedings, the court declines to apply waiver here. *See id.* at 178 ¶ 14 (noting a parent may raise reunification services issues at trial).

**II.     The superior court did not clearly err when it found DCS made diligent efforts to provide father with appropriate reunification services.**

¶19     The court has a "consequential yet narrow duty" when reviewing a superior court's order terminating a parent's rights. *In re J.C.*, 259 Ariz. at 68 ¶ 34 (quoting *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 481 ¶ 47 (2023)). The court must affirm the superior court's "legal conclusion that a statutory ground for termination has been proven by clear and convincing evidence . . . unless 'clearly erroneous.'" *Id.* (quoting *Brionna J.*, 255 Ariz. at 481 ¶ 46). The clear and convincing standard requires the superior court to find the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85 ¶ 25 (2005) (citation omitted). Under the clearly erroneous standard, the court affirms the superior court unless as "a matter of law that no one could reasonably find the evidence to be clear and convincing." *In re J.C.*, 259 Ariz. at 68 ¶ 34 (quoting *Brionna J.*, 255 Ariz. at 481 ¶ 46).

¶20     DCS makes diligent efforts to provide appropriate reunification services by allowing the parent the "time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Mary Ellen C.*, 193 Ariz. at 192 ¶ 37. DCS must "undertake rehabilitative measures" that have "a reasonable prospect of success" in reuniting the family. *Id.* at 192 ¶ 34. And DCS must "maintain consistent contact with the parent[] and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 50 (App. 2019). But DCS need not provide the parent with every conceivable service or to ensure the parent participates in every service that it offers. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

¶21     The superior court considers the totality of the circumstances to determine whether DCS made diligent efforts. *See In re J.C.*, 259 Ariz. at

68 ¶ 39 (citing *Donald W.*, 247 Ariz. at 23 ¶ 49). To satisfy this factor, DCS must "identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* (quoting *Donald W.* at 23 ¶ 50) (emphasis omitted).

¶22        Here, father limited his access to services in the Department of Corrections because of his own behavior. And father did not contact DCS when he was released. If he had, DCS could have provided more services. Instead, he again undermined any opportunity for DCS to provide services because he chose to use methamphetamine and was returned to the Department of Corrections within a week. That said, DCS provided the services it could, including case management, regular safety meetings, team decision-making meetings, service letters, and encouraging father to engage while incarcerated at the Department of Corrections.

¶23        Under these facts, the court cannot say, as "a matter of law that no one could reasonably find the evidence to be clear and convincing." *In re J.C.*, 259 Ariz. at 68 ¶ 34 (quoting *Brionna J.*, 255 Ariz. at 481 ¶ 46).

## CONCLUSION

¶24        The court affirms.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:        JR