NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JUAN P., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, S.P., *Appellees*.

No. 1 CA-JV 20-0257
FILED 4-27-2021

Appeal from the Superior Court in Maricopa County
No. JD29446
JS20181
The Honorable Lori Ash, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Suzanne W. Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the Court, in which Judge Michael J. Brown and Judge David D. Weinzweig joined.

---

**G A S S**, Judge:

¶1        Juan P. appeals the superior court's order terminating his parental rights to S.P., his biological son. Because reasonable evidence supports the superior court's order, we affirm the termination of father's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

¶2        This case has a long history, including several previous stops at this court. *See S.P. v. Juan P.* (*Juan P. I*), 1 CA-JV 16-0446, 1 CA-SA 17-0114, 2017 WL 2125729 (Ariz. App. May 16, 2017) (mem. decision); *Dep't of Child Safety v. Duncan* (*Juan P. II*), 1 CA-SA 17-0150, 2017 WL 2953353 (Ariz. App. July 11, 2017) (mem. decision); *Dep't of Child Safety v. Juan P.* (*Juan P. III*), 245 Ariz. 264 (App. 2018).

¶3        S.P. is a United States citizen, born in May 2011. *Juan P. II*, 1 CA-SA 17-0150, at *1, ¶ 2. Father "is a citizen of Mexico who, given a felony conviction, was deported in 2012 and is unable to return to the United States." *Id.* Throughout 2012, S.P. lived with father in Mexico while S.P.'s mother underwent cancer treatments. In May 2013, mother's condition improved and S.P. returned to the United States to live with her. *Id.* Soon after, father lost contact with mother and S.P., "and for nearly two years made no efforts to find them, other than contacting S.P.'s maternal aunt and uncle once." *Juan P. III*, 245 Ariz. at 265, ¶ 2. S.P.'s mother is now deceased.

¶4        In 2015, father contacted the Department of Child Safety (DCS) after learning it had taken custody of S.P. and placed him with a foster family. *Juan P. II*, 1 CA-SA 17-0150, at *1, ¶ 4. That contact began a series of proceedings between father, DCS, and Mexico's counterpart to DCS (DIF). *See Juan P. I*, 1 CA-JV 16-0446, at *1–3, ¶¶ 5–10; *Juan P. II*, 1 CA-SA 17-0150, at *1–2, ¶¶ 4–7; *Juan P. III*, 245 Ariz. at 265–66, ¶¶ 3–6.

¶5        In 2017, DCS facilitated Skype and in-person visits between S.P. and father. The Skype visits took place at a neutral location, such as S.P.'s therapist's office or a DCS office. The in-person visits occurred at a

DIF facility in Nogales, Mexico. S.P. generally failed to engage with father each time and became visibly upset after the visits, often crying and refusing to talk, play, or engage with his case aide or foster parents.

¶6 S.P.'s reactions to the visits became increasingly negative. Following the second in-person visit, S.P. "became physically ill and vomited." Over time, these behaviors became more widespread, occurring before visits and interfering with S.P.'s schooling. After one Skype visit, S.P. asked his case manager to crash the vehicle, telling her "I know it would hurt us. You should crash it."

¶7 In August 2017, father stopped participating in the Skype visits, saying he "was not happy speaking to" S.P.'s foster parents. Though S.P.'s foster parents transported him to some of the Skype visits, they did not participate. Still, at father's request, the superior court ordered the foster parents to cease transporting S.P. to his visits or therapy sessions.

¶8 In 2018, DCS facilitated additional in-person visits between S.P. and father. S.P. again became quiet and anxious during the visits, failing to interact and physically withdrawing from father's attempts to hug or touch him. But, according to the case aide, "once we crossed the border [S.P.] was more relaxed and started talking again." S.P. had one final in-person visit with father in November 2018. He again failed to engage with father, and after leaving the DIF facility, S.P. told his Court Appointed Special Advocate "when I grow up I'm going to kill myself."

¶9 Later that month, S.P. participated in a psychological evaluation with Dr. Kelly Rodriguez. She concluded S.P. was showing "signs of . . . emotional distress [at] the possibility of being removed from his [foster] family and placed with his biological father." Rodriguez believed the dependency process "may be causing additional distress to [S.P.] and may cause long-lasting negative changes to his brain development." DCS moved to suspend visits based on Rodriguez's report and S.P.'s statements of self-harm.

¶10 In January 2019, father attended his first child and family team meeting but then ceased contact with DCS. Seven months later, father moved to dismiss the dependency proceedings. The next month, DCS moved to terminate father's parental rights, alleging abandonment and fifteen months in an out-of-home placement. *See* A.R.S. § 8-533.B.1, .8(c).

¶11 The superior court held a combined hearing on the pending motions and, after the hearing, issued its ruling. The superior court denied father's motion to dismiss the dependency, finding "he made no efforts to

assert his parental rights," and only "made minimal efforts to establish a relationship with" S.P.

¶12        Turning to DCS's termination motion, the superior court found S.P. "has been in an out-of-home placement for nearly six years," but DCS "failed to make diligent efforts to provide appropriate reunification services." Despite DCS's failure, the superior court found:

> Father is not without blame. He failed to take advantage of many opportunities to build a relationship with his child. He failed to send letters and photos. He stopped the Skype visitation through the foster family. He ceased all contact with the child, even though he could have had contact. He failed to establish or maintain contact with the child through all of the avenues that were available to him.

¶13        The superior court, therefore, denied termination under the time-in-care ground but granted termination based on abandonment. The superior court also found termination of father's parental rights was in S.P.'s best interests. Father timely appealed. This court has jurisdiction under article VI, section 9, of the Arizona Constitution, A.R.S. §§ 8-235.A, 12-2101.A.1, and Ariz. R.P. Juv. Ct. 103(A).

## ANALYSIS

¶14        A superior court may sever a parent's rights if clear and convincing evidence establishes at least one statutory ground. A.R.S. § 8-533.B; *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). The superior court also must find, by a preponderance of the evidence, termination is in the best interests of the child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). Because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," this court will affirm an order terminating parental rights if reasonable evidence supports the order. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quotation omitted).

I.    **Reasonable evidence supports the superior court's abandonment finding.**

¶15        The superior court found father abandoned S.P. first in 2013, and again "by his actions in this case." Citing *Calvin B. v. Brittany B.*, father argues the first abandonment finding was error because his absence from S.P.'s life was "due to [S.P.'s mother's] actions." *See* 232 Ariz. 292, 297, ¶ 21 (App. 2013). Father similarly cites *Donald W. v. Department of Child Safety* to

argue the second abandonment finding was erroneous because "it was DCS that kept S.P. and Father apart and restricted communication." *See* 247 Ariz. 9, 28, ¶ 81 (App. 2019).

¶16        Arizona defines abandonment as:

> the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. *Abandonment includes a judicial finding that parent has made only minimal efforts to support and communicate with the child.* Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1) (emphasis added). Courts measure abandonment "not by a parent's subjective intent, but by the parent's conduct." *Michael J.*, 196 Ariz. at 249, ¶ 18. "The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *Id.* at 251, ¶ 25.

¶17        To begin, father's citations to *Calvin B.* are unavailing. The record in that case contained strong evidence the mother actively prevented the father from contacting their child, even obtaining an order of protection barring communication. *Calvin B.*, 232 Ariz. at 297, ¶¶ 23–24. By contrast, the long record here shows father voluntarily absented himself from S.P.'s life between spring 2013 and fall 2015. *See Juan P. III*, 245 Ariz. at 265, ¶ 2 ("for nearly two years [father] made no efforts to find [S.P.], other than contacting S.P.'s maternal aunt and uncle once"); *Juan P. I*, 1 CA-JV 16-0446, at *1, ¶ 4 ("Father testified that even though he knew [S.P.'s] address, he did not send any letters."). We find no error in the superior court finding father's minimal efforts during this time constitute abandonment. *See* A.R.S. § 8-531(1); *Jordan C.*, 223 Ariz. at 93, ¶ 18.

¶18        As to the superior court's second abandonment finding, father's citations to *Donald W.* are equally ineffective. In that case, the child lacked a bond to her parent because of "DCS's delay, contact restrictions, and substantial failure to try to [re]unify." *Donald W.*, 247 Ariz. at 28, ¶ 81. But here, the record shows father's willful refusal "to provide reasonable support and to maintain regular contact with [S.P.]" caused the lack of a parent-child bond. *See* A.R.S. § 8-531(1).

¶19        At trial, father agreed he was "encouraged by [DCS] and pretty much everybody in this case to write letters [and] send pictures" to

establish a relationship with S.P. Yet, father has sent S.P. only one letter since this case began in 2015. And, despite knowing S.P.'s birth date, father has not tried to contact S.P. on his birthday for at least five years. Father sought to explain his behavior by saying he "did not want to have any contact with the foster family." But father knew his letters are routed through DCS or father's attorney to S.P. without the foster family's participation or involvement. Finally, father admitted he voluntarily stopped the telephone and video calls with S.P., agreeing "that it has been a period of years since" the last call.

**¶20**     In short, father's own actions—as shown throughout the record—support the superior court's finding of abandonment. *See id.; Jordan C.*, 223 Ariz. at 93, ¶ 18.

## II.     The superior court did not err in finding termination is in S.P.'s best interests.

**¶21**     Father argues the superior court's best interests finding is erroneous because he "is a fit parent." This argument "conflate[s] the fitness inquiry with the best-interests inquiry." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 16 (2018). True, "the [superior] court may not entirely ignore the parent's interest." *Timothy B. v. Dep't of Child Safety*, 250 Ariz. 139, 146, ¶ 21 (App. 2020). But once the superior court finds a statutory ground for termination by clear and convincing evidence, it "can presume that the interests of the parent and child diverge." *Kent K.*, 210 Ariz. at 286, ¶ 35. As a result, at the best-interests stage, the "child's interest in stability and security must be the court's primary concern." *Alma S.*, 245 Ariz. at 150, ¶ 12 (quotation omitted). Termination is in the child's best interests if the child would be harmed by continuing the parent-child relationship or would benefit from severance. *Id.* at ¶ 13.

**¶22**     At trial, father admitted he sought to continue visits despite knowing S.P. "became suicidal at the prospects of having in-person visits." Father also agreed he would continue to seek custody of S.P. "even if a psychologist or doctor said that returning [S.P.] to [father] would be harmful." These statements reflect a disregard for S.P.'s physical and psychological well-being, supporting the superior court's conclusion "[S.P.] would be harmed by continuation of the parental relationship."

**¶23**     By contrast, S.P.'s foster family are meeting all his physical and emotional needs. S.P. is doing well in school and his behavior has improved since father's visitations ceased. The foster parents are prepared to adopt and willing to keep an open line of communication between S.P.,

father, and father's family. "When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a [superior] court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016). On this record, we find no error in the superior court's best-interests finding. *See id.*; *Jordan C.*, 223 Ariz. at 93, ¶ 18.

### III. Father's challenge to the denial of his motion to dismiss the dependency proceedings is moot.

¶24 Father also challenges the superior court's denial of his motion to dismiss the dependency proceedings. In general, a child is dependent if he or she lacks a fit parent. *Donald W.*, 247 Ariz. at 18, ¶ 27 (citing A.R.S. § 8-201(15)(a)(i)). As this court recognized in *Donald W.*, the statutory grounds for termination of parental rights are synonymous with parental unfitness. *Id.* (quoting *Alma S.*, 245 Ariz. at 150, ¶¶ 9–10). Because we affirm the superior court's termination of father's parental rights based on abandonment, this argument is moot.

### CONCLUSION

¶25 We affirm the termination of father's parental rights.

