NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ADAM O., ANDREA C., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.O., N.O., *Appellees*.

No. 1 CA-JV 20-0408
FILED 6-8-2021

Appeal from the Superior Court in Maricopa County
No. JD531616
The Honorable David K. Udall, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Father*

David W. Bell, Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Mesa
By Amanda L. Adams
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1        Adam O. ("Father") and Andrea C. ("Mother") appeal from the superior court's order terminating their parental rights to their two children. For the following reasons, we affirm.

## BACKGROUND

¶2        In April 2018, the Department of Child Safety ("DCS") received a report that Mother and Father were homeless and unable to meet the needs of their children, one-year-old and one-month-old little boys. The reporter disclosed that both parents had a history of mental-health issues. When DCS interviewed the parents, Mother confirmed she struggled with mental health, explaining that she has a cognitive disability and diagnoses of autism, bipolar, and attention-deficit disorders. Father stated that he has bipolar and attention-deficit disorders. Neither parent was engaged in the treatment of their mental health issues. The parents confirmed for the past six months the older boy was residing with his grandmother because they did not have stable housing. Based on this information, DCS took custody of the children and filed a dependency petition.

¶3        Initially, DCS referred the parents for psychological evaluations, a parent aide, and parenting classes, providing them with transportation assistance. The parents completed drug tests that were negative for illegal substances. In June 2018, they began their parent-aide service. The parent aide provided them with individualized parenting instruction, budgeting instruction, and housing and employment resources.

¶4        Both parents completed psychological evaluations. Dr. Sandra Graff diagnosed Father with low average to borderline intellectual functioning, attention-deficit/hyperactivity disorder, and adjustment disorder with depressed mood avoidant traits. Dr. Graff opined that unless Father receives intense parenting training, the children would be at risk of harm in his care. She recommended he participate in a

psychiatric evaluation, individual and couples counseling, parenting training, and vocational training. She also recommended a bonding and best-interests evaluation after he completed the recommended services.

¶5 Dr. Graff diagnosed Mother with borderline intellectual functioning, attention-deficit/hyperactivity disorder, adjustment disorder with anxiety, dependent traits, and a rule-out diagnosis of bipolar disorder. Dr. Graff concluded that Mother "will need ongoing professional assistance and support in order to develop effective independent parenting skills." She opined that if Mother had to independently care for the children without outside support, they would be at risk for neglect. Dr. Graff recommended Mother participate in a psychiatric evaluation, individual and couples counseling, and parenting training. As she had with Father, Dr. Graff also recommended completing a bonding and best-interests evaluation after Mother completed the recommended services.

¶6 Based on Dr. Graff's recommendation, DCS initially referred Father for a psychiatric evaluation. But because Father already had an assigned psychiatrist and behavioral-health provider, DCS determined he should self-refer for a psychiatric evaluation. The case manager relayed this information, and Father agreed to follow through. DCS also referred Father for counseling, which he began in July. Before DCS could refer Mother for additional services, both parents stopped participating in all services and failed to attend visits with the boys. After September 2018, they had no regular contact with DCS. Consequently, their parent-aide services were discontinued, with the provider noting Mother and Father had diminished capacities in all parenting skills.

¶7 In January 2019, the parents did not contest the dependency allegations, and the superior court adjudicated the children dependent. At that time, the parents were homeless and only sporadically communicated with DCS, though the case manager regularly emailed them. DCS referred the parents for supervised visits. The following month, the case manager emailed Mother to explain that because she too had an assigned psychiatrist, she should self-refer for behavioral-health services. Nonetheless, neither parent contacted their assigned psychiatrist.

¶8 In March, the case manager gave Mother the phone number for her counseling service provider and instructed her that DCS could assist her if she needed help scheduling counseling. Mother did not follow through with scheduling counseling or utilizing DCS's offer of assistance. By April, the parents had attended only three scheduled visits, so DCS placed them on call-to-confirm status. Parents attended two more

3

scheduled visits in April, but were eventually closed out for missing too many visits and lack of contact.

¶9          In May, Mother informed the case manager that she planned to self-refer to Potter's House for counseling, but she never provided proof of having done so. Father told the case manager that he would self-refer to Valle Del Sol for counseling, but he likewise failed to provide any confirming documentation. Meanwhile, the superior court set a case plan of severance and adoption. Soon afterwards, DCS moved to terminate the parents' parental rights under the mental-illness and six-months' out-of-home placement grounds, and an additional ground of mental deficiency as to Mother. *See* A.R.S. § 8-533(B)(3), (8)(b).

¶10         In June 2019, DCS again provided parent aide services, but the referral closed unsuccessfully in September because the parents missed almost all their visits and skill sessions. Through email and voicemail, DCS informed the parents that they could obtain counseling through Valle Del Sol and again gave them the contact information. Mother attended a screening at which Valle Del Sol providers recommended she participate in parenting and anger-management classes. She was offered the suggested classes, but she attended only one class. She never scheduled nor attended any counseling sessions. Again, Father did not follow through with the referral.

¶11         Next, the case manager scheduled several meetings to help the parents self-refer for their mental and behavioral-health services, but they failed to attend. In September 2019, DCS amended its termination motion to include the fifteen-months' out-of-home placement ground under § 8-533(B)(8)(c).

¶12         In March 2020, DCS again referred the parents for supervised visits, but the parents minimally participated, and the visitation was eventually cancelled. Meanwhile, the parents remained homeless and unemployed. In November 2020, the parents failed to appear without good cause at the pretrial conference, and the superior court took evidence on DCS's termination motion. The court later issued an order terminating Mother and Father's parental rights on all the grounds alleged, and the parents timely appealed that order.

## DISCUSSION

¶13         On appeal, both parents challenge the superior court's finding that DCS made diligent efforts to provide them with appropriate reunification services. They specifically point to DCS's request that they

4

self-refer for psychiatric evaluations and DCS's failure to provide them with bonding and best interests assessments. Father also argues that DCS should have provided him with a life coach.

**¶14**     When seeking to terminate parental rights under the six- or fifteen-months' out-of-home placement grounds, DCS must make "a diligent effort to provide appropriate reunification services." A.R.S. § 8-533(B)(8).  Likewise, under the mental-illness ground, DCS must make reasonable rehabilitative efforts or demonstrate that such efforts would be futile. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS must therefore provide the parent "with the time and opportunity to participate in programs designed to help [him or] her become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).[1]

**¶15**     That being said, the superior court is not required to provide the parent unlimited time to "assume [his or her] responsibilities and take positive steps toward recovery." *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). Nor is DCS required to "provide every conceivable service" or to ensure that the parent participates in the services offered. *JS-501904*, 180 Ariz. at 353. When deciding whether DCS has made diligent reunification efforts, the superior court must examine the "totality of the circumstances of the dependency." *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 26, ¶ 68 (App. 2019).

**¶16**     The parents argue that because of their mental-health and cognitive limitations, DCS should have done more than merely tell them to self-refer for psychiatric evaluations. When parents, like these, have special needs, minimal action by DCS does not amount to diligent efforts. *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 34 (when parents have mental illness, DCS is required to "undertake measures with a reasonable prospect of success"). Here, however, the superior court found that DCS repeatedly tried to assist the parents in establishing services and to engage in the services offered, including mental and behavioral-health services, all to no avail.

**¶17**     The parents failed to maintain consistent contact with DCS and their service providers, which hindered the case manager's ability to communicate with them and provide them with personalized assistance. The case manager informed the parents early in the dependency that they needed to self-refer to their current providers. In mid-2019, the case

---

[1]     Parents do not challenge the superior court's finding that severance was in the best interests of the children.

manager reminded them they needed to self-refer for behavioral-health services and emailed them instructions on how to do so.

¶18        The parents did not voice any concerns or ask for assistance with making those self-referrals until August 2019. Then, between August and October, the case manager arranged six meetings with the parents to review the available services and help them with the self-referral process. But each time, Mother and Father either did not show up or cancelled the appointments. In February 2020, the parents finally met with the case manager, who tried to review the recommended services with them and answer their questions. The parents, however, repeatedly became distracted or focused on disputing the original neglect allegations and were impervious to the case manager's attempts at redirection. In August 2020, the case manager scheduled two more meetings with the parents, but they cancelled both. Overall, the parents thwarted DCS's multiple attempts to assist them in the self-referral process and failed to engage in the services offered. Reasonable evidence supports the finding that DCS undertook diligent efforts to provide reunification services.

¶19        Next, both parents argue that DCS should have offered them a bonding and best-interests evaluation, as recommended By Dr. Graff. Father also argues that DCS should have provided him with a life coach as recommended in his psychological evaluation. The parents have waived these challenges on appeal by not raising them in superior court. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178, ¶ 16 (App. 2014) (parents must "voice their concerns about services to the juvenile court in a timely manner"). Even if they had raised these arguments, however, Dr. Graff recommended bonding and best-interests evaluations only after the parents participated in all recommended services, which they did not do. Moreover, Dr. Graff did not recommend a life coach for Father, but rather recommended that Father's individual counselor "work with him in a <u>Life Coach role</u>." Father, however, minimally participated in counseling, though the service was available to him as early as August 2018. Because reasonable evidence supports the superior court's order, we affirm.

## CONCLUSION

**¶20** For the foregoing reasons, we affirm the order terminating Mother and Father's parental rights.



AMY M. WOOD • Clerk of the Court
FILED: AA