NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

KATHRYN L., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, S.L., *Appellees*.

No. 1 CA-JV 21-0280
FILED 6-28-2022

Appeal from the Superior Court in Maricopa County
No. JD37573
The Honorable Michael F. Gordon, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, PC, Phoenix
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Cynthia J. Bailey and Judge D. Steven Williams joined.

---

**S W A N N**, Judge:

¶1        Kathryn L. ("Mother") appeals the superior court's termination of her parental rights to her daughter, S.L. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        In April 2019, police responded to a call regarding an ongoing domestic violence incident involving Mother and S.L.'s father ("Father"). Father fled the scene before police arrived. Mother had a broken nose and was hospitalized. The Department of Child Services ("DCS" or "the Department") received a report that seven-year-old S.L. and her two older sisters[1] (collectively, "the children") were present during the incident and that the home's water had been turned off.

¶3        In June 2019, DCS received a report that Father had threatened to kill the children's maternal grandmother ("Grandmother") for calling the police regarding the April incident. DCS also learned that the children were left with Grandmother. After the parents had not been seen in ten days, DCS took temporary custody of the children and placed them with their maternal grandfather. The children moved to a licensed group home in November 2019 before being placed with Grandmother in January 2020.

¶4        In June 2019, DCS filed a petition alleging the children were dependent with respect to Mother due to her inability to meet their basic needs and the parents' long history of domestic violence. The following week, Mother appeared for the preliminary protective hearing where the court ordered that the children remain in DCS custody. The court also directed Mother to begin individual counseling with a domestic violence component as well as rule-out substance abuse testing to determine if drug treatment would be necessary.

---

[1]        S.L.'s siblings are not the subject of this appeal.

¶5        The court found the children dependent as to Mother in September 2019 after she failed to appear at the dependency hearing. The court also approved a case plan of family reunification.

¶6        Mother initially participated in supervised visits with the children and attended parent aide classes. However, the visits stopped altogether when Mother moved to Chicago from May to September of 2020. Mother testified that she moved for work, as she could not find employment in Phoenix due to the COVID-19 pandemic. She did not stay in regular contact with the children while out of state.

¶7        Two months after Mother returned to Arizona, DCS requested the court change the children's case plan to severance and adoption. At that point, Mother had not completed any of the services requested by DCS, nor had she complied with court-ordered drug testing. DCS filed a motion to terminate Mother's parental rights in November 2020, alleging nine- and fifteen-months in out-of-home placement. Mother began drug testing that same month. She also enrolled in—and subsequently completed—the TERROS Substance Use Treatment Program.

¶8        The termination adjudication originally was set for March 2021. DCS requested the court continue the trial so it could evaluate whether Mother's recent engagement with services would "result in sustained progress towards reunification." The court granted the motion and continued the trial to June 2021. After Mother tested positive for methamphetamine, DCS decided to maintain its request for termination. The superior court held trial on June 2, June 3, and July 29, 2021.

¶9        In September 2021, the court entered an order terminating Mother's parental rights. Mother appeals.

## DISCUSSION

¶10        DCS moved to terminate Mother's parental rights under, inter alia, A.R.S. § 8-533(B)(8)(c), which permits termination when the Department has proved by clear and convincing evidence that:

> The child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order . . ., the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

¶11 The superior court found there was a "substantial likelihood that Mother [would] be incapable of exercising proper parental care and control in the near future" due to her failure to engage in domestic violence counseling and her uncertain commitment to sobriety. As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). Accordingly, we review the termination order in the light most favorable to sustaining the court's decision and will not disturb the order if it is supported by any reasonable evidence. *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 95, ¶ 10 (App. 2009). "Under any of the grounds enumerated in § 8–533(B), the court must also consider the best interests of the child." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002). Mother has not challenged the superior court's findings that termination of her parental rights was in S.L.'s best interests, that DCS made diligent reunification efforts, or that S.L. had been in out-of-home care for fifteen months or longer. We therefore consider those issues waived. *Crystal E. v. Ariz. Dep't of Econ. Sec.*, 241 Ariz. 576, 577, ¶ 5 (App. 2017).

I. MOTHER REFUSED TO ENGAGE IN DOMESTIC VIOLENCE SERVICES.

¶12 DCS initially became involved after the domestic violence incident in which Father broke Mother's nose. Mother testified that Father was abusive throughout the duration of their 22-year relationship. S.L. reported witnessing Father hit and choke Mother, as well as drag her out of the house on multiple occasions. Father's abuse also extended to the children. S.L. stated that Father was scary, had a "demon side," and hit her and her sisters when he was angry. She also shared that Mother did not intervene when Father hit her.

¶13 Mother argues that S.L. is no longer at risk of being exposed to domestic violence or being a victim. She notes that at the time of trial, she had not been involved in a domestic violence incident in nearly two years. Furthermore, DCS did not present evidence of domestic violence between Mother and any person other than Father. Mother also notes that she is in a healthy new relationship.

¶14 The court acknowledged Mother's progress but lacked confidence that she had "the tools to recognize and understand the control dynamics of domestic violence." Reasonable evidence supports this conclusion. Despite repeated urging by DCS, Mother refused to engage in domestic violence counseling. She only recently acknowledged the abusive

4

nature of her 22-year relationship and admitted to refusing services due to her shame. At trial, she re-asserted her belief that she does not need domestic violence counseling. Mother also failed to complete parent aide services, which would have provided her with tools to enhance her protective parenting capabilities.

¶15     Mother argues that her failure to engage in domestic violence counseling does not prove she is presently unfit to care for S.L. In support of this assertion, she cites to *Donald W. v. Department of Child Safety*, 247 Ariz. 9 (App. 2019). In *Donald W.*, DCS placed the child in out-of-home placement and filed a dependency petition without conducting an investigation. *Id.* at 18, ¶ 28. The petition did not allege any facts to support DCS's conclusion that the appellant neglected his child. *Id.* We determined that nothing in the record supported a finding that the child was or had ever been dependent as to the appellant. *Id.* at 18–19, ¶¶ 29–30. That is not the case here. In S.L.'s case, DCS alleged specific facts in the dependency petition, gave Mother instructions to address its concerns, and presented evidence that Mother failed to comply. Unlike in *Donald W.*, here, the court's decision to place S.L. in out-of-home placement was not based on a "[f]actually [d]eficient and [u]nsupportable" dependency petition. *Id.* at 18, ¶ 27.

¶16     Mother claims that the absence of domestic violence incidents in the two years preceding trial proves her fitness to care for S.L. But Mother's DCS case manager testified that leaving the abusive relationship was the start to resolving Mother's issues with domestic violence, not the fix. The case manager also expressed concern regarding Mother's unaddressed trauma due to the long duration of the abusive relationship. Finally, the case manager stated that family counseling would not be possible until Mother underwent individual counseling.

¶17     DCS asked Mother to complete domestic violence counseling on multiple occasions. By the time of trial, S.L. had been in out-of-home placement for nearly two years. Mother did not participate in counseling. Accordingly, Mother has failed to show where the superior court erred in finding she "substantially neglected to remedy the circumstances that cause[d] SL to be out of care."

II.     MOTHER TESTED POSITIVE FOR METHAMPHETAMINE TWO MONTHS BEFORE TRIAL.

¶18     The superior court found there was a substantial likelihood that Mother would be incapable of exercising proper parental care and control in the near future due to her drug abuse. Specifically, the court

found Mother's commitment to sobriety "short-lived, untested, and undermined by her dishonesty."

## A. Short-Lived and Untested Sobriety

**¶19** Mother received a referral for TERROS in June 2019 but did not show up for her intake appointment and was later closed out of the program. She was given a second referral in February 2020, but again closed out for lack of participation. Mother also failed to comply with two court orders to complete hair follicle and urinalysis testing. She did not take her first drug test until November 2020, nearly seventeen months after S.L. was removed from her care. However, all of her urinalysis tests since then yielded negative results, and she completed TERROS in April 2021.

**¶20** DCS's concerns regarding Mother's sobriety stemmed from the results of her hair follicle tests. Mother submitted hair follicles for testing in December 2020, March 2021, and April 2021. All three samples tested positive for methamphetamine. It was not until May 2021, just one month before the trial, that Mother produced a negative hair follicle test.

**¶21** At trial, Mother's DCS case manager testified that a person should demonstrate sobriety for six months before the Department no longer considers their substance abuse an ongoing present concern. Mother argues that there is no evidence in the record that she used methamphetamine in the seven months immediately preceding the June 2021 trial. But her hair follicles tested positive for methamphetamine in March and April of 2021, indicating use within the previous 90 days. Mother offered an innocent explanation for her positive results, but the superior court resolved this conflict against her. Because that court is uniquely situated to resolve conflicts in the evidence, we will not disturb its findings unless clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, 282, ¶¶ 4, 12 (App. 2002). Here, the record contained reasonable evidence to support the court's conclusion.

## B. Dishonesty Regarding Sobriety Date

**¶22** Mother initially reported her sobriety date to TERROS as May 2020. During a phone call with her case manager in February 2021, Mother claimed to have stopped using methamphetamine in Summer 2020. After learning that follicle results go back 90 days, she changed her sobriety date to September 2020. The superior court took these shifting dates to mean Mother was dishonest regarding her sobriety. We do not re-weigh the superior court's credibility determinations. *Id.* at 282, ¶ 12.

C.      Environmental Exposure

¶23      Mother's December 2020, March 2021, and April 2021 hair follicles tested positive for methamphetamine.  These samples were all tested by DTL Labs.  Mother insisted she was not using methamphetamine and submitted a hair follicle to Fast Labs of Glendale ("Fast Labs"), a private testing company, in May 2021.  This May sample tested negative for methamphetamine.   DCS obtained an expert toxicologist to analyze Mother's past drug tests at the court's request.

¶24      At trial, the toxicologist noted that Mother's March and April follicle tests were positive for methamphetamine but showed an absence of amphetamine metabolites.   That, in combination with her negative urinalysis results, led him to believe Mother's results were "consistent with environmental exposure; that is, being around meth smoke users."   The toxicologist also testified that DTL Labs specifically tests for environmental exposure, whereas Fast Labs extensively washes hair samples to avoid positives derived from environmental exposure.  He also explained that because methamphetamine is "sticky," it would take very little exposure to result in a positive hair sample.

¶25      To be sure, the superior court emphasized its belief that Mother's positive hair follicle results from December and March reflected substance abuse in the 90 days before testing.  Nevertheless, the court found environmental exposure alone cause for concern, stating:

> Mother, newly sober, would have been associating closely with methamphetamine users while they smoked it----- making relapse far more likely. Moreover, it is axiomatic that the methamphetamine users, whoever they may be, pose independent safety risks associated with diminished judgment and erratic behavior to Mother and by extension to SL.

¶26      Mother asserts that by the time of trial, she had not used methamphetamine for at least seven months.  When faced with sharply disputed facts, we defer to the superior court's findings unless no reasonable evidence supports them. *Jesus M.*, 203 Ariz. at 280, ¶ 4.  Mother claims the court's determination that she spent time with methamphetamine users is pure speculation unsupported by evidence. She offers an alternate explanation for the environmental exposure: that she uses public transportation and works in a busy hospital.  However, there is no evidence in the record that such contact with the public could have

resulted in positive follicle tests. Mother did not ask the toxicologist to opine on those matters. The toxicologist did, however, testify that environmental exposure occurs when one is around methamphetamine smoke or users, and requires more than "touching the doorknob or brushing up against something of that nature." The superior court's conclusion therefore was supported by reasonable evidence.

¶27 We conclude that there was reasonable evidence in the record that Mother would be incapable of exercising proper parental care and control due to drug abuse and domestic violence. As the superior court properly granted termination on the fifteen months' out-of-home placement grounds, we need not address the nine months' ground. *Jesus M.*, 203 Ariz. at 205, ¶ 3 ("If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.").

## CONCLUSION

¶28 Seeing no error, we affirm.

