NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

## IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.H.

No. 1 CA-JV 23-0072
FILED 11-7-2023

---

Appeal from the Superior Court in Maricopa County
No. JD28565
The Honorable Julie Ann Mata, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office
Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee J.H.*

---

**MEMORANDUM DECISION**

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Chief Judge David B. Gass joined.

---

**J A C O B S**, Judge:

**¶1**         The father of the child J.H. ("Father") appeals the juvenile court's order terminating his parental rights with respect to J.H. under A.R.S. § 8-533(B)(8)(c), the fifteen-month out-of-home care ground.  We reject Father's challenges to the order because reasonable evidence supports the juvenile court's findings that the Department of Child Safety ("DCS") made diligent efforts to reunify the family, and that termination was in J.H.'s best interests.  We thus affirm.

## FACTS AND PROCEDURAL HISTORY

### A.     Father's Difficulties Caring for J.H. Came to the Attention of DCS.

**¶2**         J.H. came to the attention of DCS in January 2021 through a hotline report.  The report alleged Father left his then three-year old J.H. with a friend, Ashley, and neglected to pick up J.H. or respond to communications about them for several days.  The report further alleged Ashley was a drug user and mentally unstable and could not care for J.H.

**¶3**         Father maintained he could not have picked up J.H. from Ashley for various reasons.  Father explained he could not take physical custody of J.H. for several days and was then living in a homeless shelter.  Upon determining Mother's whereabouts were unknown and that Father was unable to care for J.H., DCS investigators took J.H. into custody pursuant to a court order.

**¶4**         Medical professionals soon determined J.H. showed signs of neglect.  Nearly four years old, he still could not speak clearly, did not know the alphabet or how to count, and did not recognize colors.  He also had bruised arms and legs and untreated eczema likely caused or exacerbated by being left in soiled diapers.

**¶5**         J.H. was later diagnosed with high-functioning autism.  His caregivers reported he occasionally experienced violent outbursts because he had difficulty with social interactions.  DCS enrolled J.H. in behavioral, occupational, physical, and speech therapies, through which J.H. improved significantly.  J.H. has formed close bonds with his foster parents, his foster brother, and a friend at school.

### B.         The Court Declares J.H. Dependent as to Father, Who Then Experiences Legal and Behavioral Difficulties.

**¶6**         On DCS' motion, the juvenile court found J.H. dependent as to Father and outlined a family reunification case plan.  For Father to regain custody, he needed stable housing, employment, and a demonstrated ability to meet J.H.'s basic and developmental needs.  DCS referred Father to various services, including a psychological evaluation by Dr. Menendez, a Ph.D. psychologist, who assessed Father with below-average intelligence and limited knowledge of child development.  She diagnosed him with borderline intellectual functioning and suggested Father was unlikely to be able to raise J.H. with his assessed parenting skills.  She offered treatment recommendations to improve his parenting skills.

**¶7**         Roughly three weeks later, Father was arrested for attempting child sex trafficking through online communication with an undercover officer posing as a minor.  He pled guilty to attempted child sex trafficking, a class 3 felony, in August 2021.  After two months in jail, he was released on lifetime probation as a sex offender.  Father was not allowed contact with any child other than J.H. and faced computer restrictions.  The record did not indicate Father was interested in either pre-pubescent children or incest.

**¶8**         Upon his release from jail, DCS referred Father for substance abuse evaluation and drug testing.  For nine months, Father consistently tested, and all but one of his tests were negative.  Nevertheless, Father remained inconsistent in visiting J.H., even after adjustments were made to accommodate his work schedule.  DCS's case manager Mr. Harrison provided support, facilitating necessary appointments and reminders.

**¶9**         In February 2022, Father enrolled in a sex-offender treatment program his probation required, later undergoing a psychosexual evaluation.  This evaluation, though incomplete, showed Father minimizing his offense and seeking to blame the victim for his conduct.  Dr. Rodriguez had concerns about Father's treatment success due to cognitive limitations, instability, and parenting deficits, demonstrating

potential risks to J.H.'s safety. DCS also obtained Father's sex-offender treatment records, revealing a high risk of sexual reoffending.

¶10        DCS also provided Father with visitation services throughout the case. However, it stopped providing visitation while Father was incarcerated from late June of 2021 to mid-August of 2021 and not allowed to have contact with minors. After his release from jail, Father requested that DCS reinstate visits. DCS referred Father for supervised visits, drug testing and treatment, and asked him to enroll in individual counseling. Father failed to consistently attend or complete individual counseling.

¶11        In the next three months, Father only visited J.H. once, failed to keep in touch with service providers and DCS, and missed court hearings. Father also completed parenting classes in August 2022, but he continued to deny any responsibility for J.H. coming into DCS' care and maintained that it had been a misunderstanding.

> ### C.    The Court Changes J.H.'s Case Plan to Severance and Adoption, Ultimately Terminating Father's Parental Rights on the Fifteen-Month Out-of-Home Placement Ground.

¶12        In January 2022, the juvenile court changed J.H.'s case plan to severance and adoption. DCS moved the court to terminate the parent-child relationship between J.H. and his parents.

¶13        The court suspended Father's in-person visits and directed DCS to arrange virtual visits for Father. This decision stemmed from Father's inconsistent attendance at in-person visits and J.H.'s adverse reactions during those visits. J.H. began refusing to enter cars associated with Father's visits and displaying aggressive behavior towards those attempting to place him in the car.

¶14        Over the next year, DCS provided Father with reunification services, including drug testing, treatment, and virtual visitation, and assisted Father with self-referrals for individual counseling and neurological evaluation. His participation in services was inconsistent and he cancelled his first scheduled virtual visit with J.H. in March 2022. Although he continued to request in-person visits at court hearings, he continued to miss or cancel the virtual visits with J.H. When Father did attend the virtual visits, J.H., who participated in virtual visits with other family members and providers, refused to talk to father and eventually started turning off the video as soon as Father appeared on the screen.

¶15          In May 2022, the court reaffirmed its prior order that Father's visits occur virtually, finding in-person visits would be counterproductive to Father's ability to form a relationship with J.H. and could actually endanger J.H.  At the November 2022 report and review hearing, the court suspended Father's virtual visits and encouraged him to write letters to J.H.

¶16          Meanwhile, in early 2022, Father moved into the house of a girlfriend he met in October 2021.  DCS assessed her as a possible safety monitor and determined that she would not be appropriate because she minimized the severity of Father's criminal offense.

¶17          By the time of the termination adjudication, five-year-old J.H. had been in care for over two years and was thriving.  He had transitioned to a regular school for kindergarten, performed well academically with an individualized education plan, and formed strong bonds in his foster home, particularly with his foster brother and parents.

¶18          On February 24, 2023, the court held a termination adjudication.  The court found J.H. had been in an out-of-home placement considerably longer than 15 months.  The court found that DCS had diligently provided reunification services, which if completed would likely have resulted in reunification.  The court found that Father has not been able to remedy the circumstances that caused out-of-home placement because J.H. refuses all visits, and Father does not appreciate his prior neglect or the wrongfulness of his crime.  The court found Father's progress insufficient in addressing the reasons for J.H.'s foster care placement because he would not commit to any reunification services, accepted no culpability for his crime, and was not parenting any of his six children.  The superior court also found it was substantially unlikely Father would be able to parent J.H. in the near future.

¶19          The court also found termination to be in J.H.'s best interests. The court noted that J.H. is adoptable and likely to be adopted in his current foster placement, with whom he is "exceptionally bonded."  The court also weighed that J.H. refuses visits with Father, that Father was convicted of a crime with a child victim, and that Father's probation prevents him from transporting J.H. to his therapy and thus from participating in it as well. Consequently, the court found terminating Father's parental rights in the best interests of the child, and ordered them terminated.

**¶20**        Father timely appealed.  This court has jurisdiction under A.R.S. § 8-235(A) and Article 6, Section 9 of the Arizona Constitution.

## DISCUSSION

**I.        Reasonable Evidence Supports the Juvenile Court's Finding that DCS Made a Diligent Effort to Provide Reunification Services.**

**¶21**        Father challenges the juvenile court's determination that DCS made a diligent effort to reunify him with his son, arguing DCS failed to accommodate his disabilities.  DCS argues that while a "diligent effort" to provide appropriate reunification services to the parent under A.R.S. § 8-533(B)(8) is required, it is not required to "provide every conceivable service or to ensure that the parent participates in [the] service[s]." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).  This court accepts the juvenile court's factual findings "if reasonable evidence and inferences support them." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023) (citing *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579-80 ¶ 10 (2021)) (cleaned up).  We defer to these findings because "the juvenile court is in the best position to weigh evidence and assess witness credibility." *Id.*

**¶22**        The determination of what constitutes diligent efforts by DCS is case-specific.  DCS must identify the factors that led to the child's out-of-home placement and subsequently offer services that hold a reasonable prospect of rectifying these conditions.  *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 50 (App. 2019).  Moreover, when a parent is disabled, as Father claims he is, DCS must follow the Americans with Disabilities Act (ADA) and make reasonable accommodations to accommodate the parent's disability. *Jessica P. v. Dep't of Child Safety*, 251 Ariz. 34, 38 ¶ 14 (App. 2021).

**¶23**        The record refutes Father's claim that DCS did not diligently provide reunification services.  DCS consistently referred Father to a range of services and evaluations, including a psychological evaluation by Dr. Menendez, who provided treatment recommendations to improve his parenting skills.  DCS referred Father for substance abuse evaluation and drug testing upon his release from jail.

**¶24**        Unfortunately, Father's participation remained weak and inconsistent, as he failed to complete the psychosexual evaluation and individual counseling.  Furthermore, Father missed numerous in-person and virtual meetings with J.H., which highlighted Father's pattern of disengagement from the services he complained were not adequate.

¶25 Father objects that DCS failed to accommodate his claimed intellectual disability. As an initial matter, reasonable evidence supports the conclusion that Father is not disabled, as Dr. Menendez opined that his IQ was "beyond the range of an intellectual disability." While the juvenile court did not expressly conclude that Father was not disabled, it could reasonably have concluded he was not, and we will assume the court found facts necessary for its legal conclusions. DCS' prior agreement to accommodate his claimed intellectual disability, which Father notes, did not require the juvenile court to find one existed.

¶26 But assuming Father was disabled, the record cannot be read to suggest he was not accommodated. For one thing, Father's brief in this court faults DCS for not "asking Father which form of communication he found most effective," but it never says what form of accommodation as to communication DCS failed to make. This argument does not allow us to rule for Father, because he cannot show an abuse of discretion from the omission of an unspecified form of communication. We also agree with J.H., whose brief notes that DCS "utilized several forms of communication to keep in contact with [Father], including telephone calls, in-person meetings, services letters, e-mails, and text messages." DCS communicated reasonably with Father, whatever his communication needs and preferences. Importantly, DCS facilitated Father's awareness of appointments properly, and DCS need not ensure Father actually participates in the provided services. *See JS-501904*, 180 Ariz. at 353.

¶27 Father's claim that he was not provided a recommended neurological evaluation is likewise unpersuasive. Harrison, DCS's caseworker, helped Father self-refer for such an evaluation in April 2022, both meeting with Father and calling Mercy Care to get him a list of providers from which to choose. Harrison even offered to help schedule the evaluation for Father once he picked a provider. DCS also referred Father to Terros, where he received help with his seizure disorder, further aiding his neurological health. The juvenile court did not err by failing to find a lack of diligent efforts to reunify from a supposed failure to provide a neurological evaluation.

¶28 Finally, Father's claim that DCS did not make diligent efforts to reunify because of a lack of visits with J.H. is likewise unavailing. Father is responsible for much of the period in which he could not visit J.H. Father was incarcerated for attempting to commit a sex offense with a minor for two months in 2021, and could not then have contact with any minors, including J.H. While on probation thereafter, DCS arranged one visit, but Father fell out of contact with DCS.

**¶29** DCS asked the court to suspend visits in January 2022 because J.H. would become upset when he recognized a van he associated with visiting Father. The juvenile court restricted visits to a virtual format in January 2022 given the harm to J.H. attending them. Unfortunately, J.H. would terminate the video visits as soon as J.H. saw Father. In May 2022, the juvenile court then found that danger to J.H. justified the cessation of visits altogether. Father properly concedes that the finding of danger justified cessation of visits at that time.

**¶30** Father nonetheless contends that the juvenile court's November 2022 order continuing its suspension of visits made DCS's efforts non-diligent because that order was not supported by a repeated finding of danger from visits. This argument fails for several reasons. First, the record was replete with facts from which the juvenile court could reasonably have concluded that J.H., an autistic child who physically endangered himself when made to visit Father, might continue to do so. Second, the juvenile court's order suspending visitation was a final, appealable order Father failed to challenge in this court. *See Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 374 (App. 1994). As the juvenile court noted in finding diligent efforts, Father also failed to request a hearing on it before the juvenile court. The suspension of visits was supported by reasonable evidence, and Father did not take further steps in disagreement with it at the time. On this particular set of facts, we cannot say the juvenile court abused its discretion by finding DCS had made diligent efforts to reunify this family.

**II.   Reasonable Evidence and Inferences Support the Juvenile Court's Finding that Termination Is in J.H.'s Best Interests.**

**¶31** We accept the juvenile court's findings as to J.H.'s best interests "if reasonable evidence and inferences support them." *Brionna J.*, 255 Ariz. at 478 ¶ 30 (citing *Jessie D.*, 251 Ariz. at 580 ¶ 10 (2021)). As both DCS and J.H. point out, Father has not disputed the juvenile court's findings regarding J.H. thriving in the adoptive placement, the closeness of J.H. to the foster parents, and the benefits of termination to J.H. Conceding that a relationship with Father would be detrimental to J.H., potentially exposing J.H. to instability and the risk of emotional, physical, or sexual abuse, Father concedes the premises of the juvenile court's best interest finding. *See Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960).

**¶32** Father nonetheless challenges the juvenile court's best interest finding, arguing the juvenile court erred in this finding because it did not consider or order permanent guardianship of J.H. by a foster parent willing to serve in that capacity. This analysis fails for three reasons.

**¶33** First, A.R.S. § 8-533(B) calls for a best interest analysis, and the juvenile court conducted one. A best interest analysis asks whether termination will benefit the child, or continuing the relationship will harm the child. *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). As just noted, Father concedes all of the premises of the best interest analysis the court did conduct. And as J.H. points out, that analysis is supported by the record. For this reason, there is no need to consider within the best interest analysis an alternative (here, guardianship) to a beneficial termination or a detrimental continuation of the parent-child relationship.

**¶34** Second, Father's reliance on *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470 (2022) to advance this argument is misplaced. *Timothy B.* required consideration of a permanent guardian in terminations under A.R.S. § 8-533(B)(4), the statutory text of which requires consideration of maintaining a "normal home" during a parent's lengthy incarceration. *See id.* at 474-77 ¶¶ 16-27. Here, Father is not incarcerated, and A.R.S. § 8-533(B)(8)(c) furnishes very different grounds for termination – fifteen months of care out-of-home, a failure to remedy the cause of out-of-home placement, and an unlikelihood of proper and effective parental care and control in the near future. *Timothy B.* does not suggest a court must consider permanent guardianship where the grounds for termination do not require determining whether termination will deprive a child of a "normal home for a period of years." *See id.* Nor would it be logical to intuit the need in A.R.S. § 8-533(B)(4) for such a determination where the parent is at liberty and determined to be substantially likely unable to parent in the near term.

**¶35** Third, Father's argument ignores the guardianship statute. Under it, the court may only establish a guardianship where adoption is a remote possibility "or termination of parental rights would not be in the child's best interest." *See* A.R.S. § 8-871(A)(4). Here, the juvenile court found, and Father has not challenged, that adoption is likely. And other than preferring a permanent guardianship, Father has not challenged the findings underpinning the juvenile court's conclusion that termination is in J.H.'s best interests.

¶36 The juvenile court's ruling that terminating Father's parental rights is in J.H.'s best interests is supported by reasonable evidence and inferences.

**CONCLUSION**

¶37 We affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA