NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO M.K. and M.K.

No. 1 CA-JV 23-0174
FILED 07-11-2024

---

Appeal from the Superior Court in Maricopa County
No. JD533308, JS21437
The Honorable Ronee Korbin Steiner, Judge

**AFFIRMED**

---

COUNSEL

Zion K., Buckeye
*Appellant*

Law Office of Ed Johnson PLLC, Peoria
By Edward D. Johnson
*Advisory Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Arizona Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge Kent E. Cattani and Judge D. Steven Williams joined.

---

**K I L E Y**, Judge:

¶1        Zion K. ("Father") appeals the juvenile court's order terminating his parental rights to his children, "Mary" and "Mia."[1] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and Savannah B. ("Mother") are the biological parents of Mary and Mia, born in 2020 and 2021, respectively. Mother is also the biological mother of "Michael," born in 2014.[2]

¶3        In January 2020, DCS received a report that other tenants at the parents' apartment complex in Tempe had complained that Father and Mother were "fighting" and "yelling" and that Father could be "heard screaming and cussing at" five-year-old Michael. On one occasion in late 2019, Mother "was seen smacking [Michael] on the face." In February 2020, DCS received another report after a neighbor found Michael wandering alone outdoors at the apartment complex late at night. Mother later told a DCS representative that she and Father had asked a friend to babysit Michael while they "went to a bar . . . and then to McDonalds for dinner," and that the friend unexpectedly left the apartment before they got home, leaving Michael alone.

¶4        Shortly after Mary was born in March 2020, Father and Mother were evicted from their home. They moved to Oregon for several weeks. While there, police were called after a third party witnessed Father "forceful[ly]" hit Michael with a belt.

¶5        After moving back to Arizona in April 2020, DCS received reports that Father and Mother were subjecting Mary and Michael to "yelling, arguing, and aggressive behaviors." DCS also learned that Father and Mother had previously been evicted and were now "homeless and

---

[1] We use pseudonyms to protect the identities of the children.
[2] Mother and Michael are not parties to this appeal.

unemployed," with "no way to provide for the basic needs of their children."

¶6          After determining that the parents' neglectful and abusive behavior put the children at risk, DCS removed Mary and Michael from the parents' care, placing them together in a temporary kinship placement.[3] DCS then petitioned for dependency, alleging that the parents failed to "provide proper and effective parental care and control." DCS also alleged that Father "hit [Michael] with a belt," "has exhibited aggressive and volatile behaviors," and "presents as unstable." In August 2020, the court found Mary dependent as to both parents and Michael dependent as to Mother.

¶7          DCS offered Father reunification services, including psychological and mental health services and counseling, substance abuse treatment and testing, parent aide services, and supervised visitation. Father largely failed to engage in those services. He completed only one of 22 scheduled drug tests, and the results of that single test were positive for methamphetamine. He failed to participate in the substance abuse treatment and mental health services DCS offered, and though he initially participated in parent aide services, those services were closed unsuccessfully in October 2020 in part due to Father's lack of engagement.

¶8          While providing reunification services, DCS officials noted concerns on multiple occasions about Father "exerting power over" Mother. During one joint meeting, the case worker recalled, Mother repeatedly "start[ed] to say something" but "stopped talking" and apologized when Father "looked at her." Likewise, when the DCS aide directed questions at Mother during parent aide sessions, Father would interrupt and answer for her.

¶9          In November 2020, Father and Mother went camping with another woman (whom Father referred to as a "sister wife") and her eight-month-old child. During this outing, Father discharged a BB gun in the vicinity of the baby, striking her in the head and the arm. Father, Mother, and the child's mother waited several hours before seeking medical attention for the child and then concocted a story to cover up how she had sustained the injuries. An examination at the hospital revealed that the child had "shrapnel in her front[al] lobe" and "a 'pellet' lodged in her right arm." The ensuing police investigation uncovered that Father, Mother, and the child's mother provided false information about the shooting because

---

[3] Mary and Mia are now together in a different kinship placement.

all three were "fighting DCS" for "custody for their other children and did not want to lose [the injured child] or the baby that [Mother] [was] currently pregnant with." Father and Mother were then arrested. Father was jailed and has been in custody ever since.

¶10        After obtaining a warrant, investigating detectives searched electronic devices belonging to Father and Mother for messages they exchanged about the shooting. Police found "several images of child pornography" on Father's iPad and in "a 'hidden' folder in his photos" on his phone. The images, which were "screenshotted and saved" during a FaceTime call between Father and another woman, show "a nude, pre-pubescent female" of "approximately three years of age" posing in "several positions" with "her genitals exposed." Father later identified the woman in the images as his "girlfriend" and the naked child as his daughter. Father was subsequently charged with multiple counts of sexual exploitation of a minor.

¶11        After Mother gave birth to Mia in April 2021, DCS petitioned for dependency, alleging that Mia was dependent due to factors that include her parents' "ongoing history of domestic violence," Mother's "failure to protect" her children "from [Father's] physical abuse," and Father's incarceration. The court found Mia dependent as to both parents.

¶12        In January 2022, the court changed the case plan as to Father from family reunification to severance and adoption. DCS moved to terminate Father's parental rights to Mary in February 2022 and to Mia in September 2022.

¶13        In July 2022, a jury convicted Father of two counts of aggravated assault, class 3 felonies in violation of A.R.S. § 13-1204(A)(2), and one count of child abuse in violation of A.R.S. § 13-3623(A)(1), based on his actions during the November 2020 shooting incident. Then, in early 2023, a jury convicted Father of seven counts of sexual exploitation of a minor under 15 years of age, class 2 felonies in violation of A.R.S. § 13-3553(A)(2), based on the sexually explicit images of the young child found on his electronic devices. Father was sentenced to 24 years in prison for the 2022 convictions and an additional 70 years in prison for the 2023 convictions, for a total prison term of 94 years. His projected release date is in 2101.

¶14        The juvenile court held a two-day termination hearing in August 2023. The DCS case manager testified about Father's actions that led to DCS's involvement in this case and about the subsequent events that

4

resulted in Father's criminal convictions and imprisonment. She further testified that, since his incarceration, DCS arranged for Father to have virtual supervised visits with the children and provided him with written parenting skills materials. The case manager went on to state that the children have cried and "act[ed] out" before and during virtual visits with Father and that their placement expressed concern that the visits were negatively affecting the children.

¶15 The DCS case manager testified that, apart from attending virtual visits with the children, Father had made no effort to maintain his relationship with them by sending them letters, cards, or gifts.

¶16 When asked whether, in her opinion, Father would ever be able to exercise effective parental care, the case manager answered in the negative, noting that Father will "remain[] incarcerated until 2101." She also testified that Father's convictions for child abuse, aggravated assault on a child, and sexual exploitation of a minor show that he does not safely interact with children.

¶17 The case manager also testified that the children were together in a kinship placement who was meeting their needs and who was willing to adopt them. Noting that the children were not currently adoptable because family reunification remained the case plan as to Mother, the case manager testified that termination of Father's parental rights would be in their best interests even if Mother's rights were not terminated. "It would not be in the best interest of the children to maintain contact with [Father]," she explained, because "he will never be able to safely parent [them]." Moreover, she added, "if [Father's] rights were to remain intact," he may be able to continue to exert "control over [Mother] in the future," leaving the children at risk of Father's continued abuse.

¶18 Father testified that he had a positive relationship with the children before his incarceration, stating, "When I wasn't working, I would . . . take them fishing," "go get ice cream," watch TV with them, and "play[] a lot." Father denied the case manager's testimony that he had not sent mail to the children since his incarceration, insisting that he mailed the letters directly to the placement's home rather than providing the letters to DCS to forward to the children. Father also stated that he has "not received any service from DCS," which, he complained, "is a violation of my rights as a parent." Father admitted, however, that he never objected to the purported inadequacy of the services being offered at any point before he was incarcerated in November 2020.

**¶19** Father testified that, while on camera during one virtual visit, Mary "spread her legs and point[ed] at" her genitals. Recognizing that such behavior is "not appropriate" for a child of "her age," Father stated, he concluded that the children must have been exposed to sexual acts by their placement. As a result, he testified, he reported the children's placement to the police.

**¶20** When asked about his convictions for sexual exploitation of a minor, Father identified the woman shown in the images stored on his phone and iPad as his "girlfriend." When asked if the naked child in the images is his biological child, he replied, "Yes."

**¶21** After the hearing, the juvenile court issued a detailed ruling finding that DCS had established, by clear and convincing evidence, all of the statutory grounds for termination it had alleged. The court further found that Father abused and neglected "an 8-month-old baby" by shooting her "with a BB gun" and then "delay[ing] seeking medical care for [her]," and that his convictions for sexual exploitation of a minor show that he "is or would be unfit to parent or assume any parental responsibility."

**¶22** The court determined that DCS had offered a variety of services to Father before his incarceration and that he "engaged in almost" none of them. The court found that, after being incarcerated, Father "failed to send cards, gifts or letters" to the children and "made no real effort to maintain" his relationship with them. The court expressly rejected, as "completely lacking in credibility," Father's claim to have mailed letters to the children at their foster home.

**¶23** The court also determined that termination would be in the children's best interests, finding, *inter alia*, that they were "thriving" in an "adoptive kinship placement together." The court further found that maintaining the "parent-child relationship would be detrimental" to the children because "the conduct that resulted in [Father's] very long-term incarceration" shows that he is "a danger to children in general." Father's conviction for possessing sexually explicit images of a child he identified as his daughter, the court found, establishes "a grave danger that Father could try and obtain similar photos of" Mary and Mia, who are, the court noted, close in age "to the victim in the [sexual exploitation] case." Moreover, the court observed, "Father's history of control and manipulation over Mother" raises "serious concerns" whether Mother could "properly protect the children if Father's rights remain intact." Maintaining Father's rights to the children, the court concluded, would leave them "in harm's way."

¶24      The court concluded by ordering the termination of Father's parental rights to Mary and Mia on the grounds of abuse and neglect, *see* A.R.S. § 8-533(B)(2), length and nature of incarceration for felony conviction, *see* A.R.S. § 8-533(B)(4), and out-of-home placement, *see* A.R.S. § 8-533(B)(8)(c). Father now appeals. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶25      A parent's right to custody and control of his or her child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interest. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). Statutory grounds for termination include abuse, neglect, length of incarceration for felony conviction, nature of felony offense, and out-of-home placement. A.R.S. § 8-533(B)(2), (4), (8).

¶26      An order terminating parental rights will be affirmed absent an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "Because the trial court is in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings, this court will not reweigh the evidence but will look only to determine if there is evidence to sustain the [juvenile] court's ruling." *Id.* (cleaned up).

¶27      Father disputes many of the findings that the juvenile court made in support of its determination that DCS had met its burden of establishing statutory grounds for termination. He denies, for example, that he ever abused or neglected the children, insisting, "I was . . . keeping my kids safe." "There was never violence in the home," he states, and although he admits striking Michael with a belt on one occasion, he insists that he was justified in doing so to "train[] him" not to misbehave. "I have not broken any laws," he maintains, and "there is and was no danger" to the children's "safety nor mental health."

¶28      As the juvenile court correctly found, however, Father has been convicted of numerous felonies for victimizing young children. The court further found that Father's possession of sexually explicit images of a young child that he identified as his daughter gives rise to "a grave danger that Father could try and obtain similar photos of" Mary and Mia. The

juvenile court acted within its discretion in finding grounds for termination of Father's rights to Mary and Mia based on Father's conduct, of which he stands convicted, in victimizing other children. *See Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 226-27, 231, ¶¶ 8, 13, 31 (2020) (affirming termination, under A.R.S. § 8-533(B)(2), of parents' rights to three children based on physical abuse of one of them, reasoning that the "statute's plain language does not require a showing that the parent neglected or abused *each child* in the proceeding" and that injuries to one child established a "risk of abuse" to the other two) (emphasis added); *see also In re Juv. No. J-2255*, 126 Ariz. 144, 146-47 (App. 1980) (finding that a parent's "prior convictions for molesting young girls provided a rational inference of his unfitness as a parent" under A.R.S. § 8-533(4)).

**¶29**       Father disputes the factual and legal bases for his criminal convictions, insisting, for example, that he "was nowhere near the gun[]" when the eight-month-old child was shot in November 2020 and that the sexual images later found on his devices were obtained through an unlawful search warrant. But Father's convictions in those cases have been affirmed on appeal, *see State v. Kauffman*, 1 CA-CR 22-0362, 2023 WL 4879156 (Ariz. App. Aug. 1, 2023) (mem. decision); *State v. Kauffman*, 2 CA-CR 2023-0095, 2023 WL 8235002 (Ariz. App. Nov. 28, 2023) (mem. decision), and he is not entitled to collaterally challenge his convictions in this case, *see Yavapai Cnty. Juv. Action No. J-9365*, 157 Ariz. 497, 500 (App. 1988) (noting that criminal conviction that "was finally adjudicated" is "not subject to collateral attack" in termination case).[4]

**¶30**       Father argues that DCS did not provide appropriate reunification services. According to Father, all DCS did was send him a "work book to do" and "would not give other services to [him]."

**¶31**       As noted above, the juvenile court found that DCS had made the required showing of statutory grounds for termination based on length-of-incarceration and 15 months' time-in-care. *See* A.R.S. § 8-533(B)(4), (8)(c). A parent's rights generally cannot be terminated on those grounds absent a showing that DCS made diligent efforts to provide appropriate reunification services. *See Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582, ¶ 21 (2021) ("If DCS seeks to terminate parental rights under [A.R.S.] § 8-533(B)(4)'s provision addressing the parent's length of felony sentence, and an incarcerated parent requests reunification services, such as visitation, and providing the services will not endanger the child, DCS must make

---

[4] We take judicial notice of the decisions of this court affirming Father's criminal convictions. *See State v. Rhome*, 235 Ariz. 459, 461, ¶ 8 (App. 2014).

reasonable efforts to provide these services."); *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17, ¶ 26 (App. 2019) (noting that before parental rights can be terminated under A.R.S. § 8-533(B)(8)(c), DCS must establish, *inter alia*, that it "made a diligent effort to provide appropriate reunification services").

**¶32**          The court also found, however, that DCS had made the required showing of statutory grounds for termination on abuse, neglect, and nature-of-felony grounds. *See* A.R.S. § 8-533(B)(2), (4). Father cites no authority, and we are aware of none, holding that a parent's rights cannot be terminated on those grounds unless DCS first provides reunification services. *See In re X.B. & D.B.*, 1 CA-JV 23-0226, 2024 WL 2032759, at *2, ¶ 12 (Ariz. App. May 7, 2024) (mem. decision) (noting that A.R.S. § 8-533(B)(2) "contains no express language requiring [DCS] to make reasonable efforts to provide reunification services before termination under the neglect or abuse ground" and that no Arizona court has "required such services when termination is sought under such ground"). Because the court terminated Father's rights on multiple grounds that do not require DCS to provide reunification services, Father's complaint that DCS did not provide such services, even if true, would not entitle him to relief.

**¶33**          Further, "[r]eunification services are not required to be provided if the court finds by clear and convincing evidence that" an aggravating circumstance exists, such as if the parent "committed an act that . . . caused a child to suffer serious physical injury." A.R.S. § 8-846(D)(1)(d). Here, the juvenile court expressly found that an aggravating circumstance exists, citing Father's convictions for aggravated assault and child abuse after he "shot an 8-month-old baby," leaving her "permanently disabled." This finding, which is supported by evidence in the record, establishes that DCS had no obligation to provide reunification services. *See id.*

**¶34**          Even assuming that DCS was required to make diligent efforts to provide reasonable reunification services to Father, the record clearly establishes that DCS did so here. Prior to Father's incarceration in November 2020, DCS offered him substance abuse testing and treatment, mental health services, parent aide services, and supervised visitation. Father initially completed a hair follicle test, which was positive for methamphetamine, but subsequently failed to submit to any further testing or undergo any substance abuse treatment. DCS also scheduled Father for a psychological evaluation and referred him for counseling, but he failed to participate in either. As the juvenile court found, DCS "offered Father services between April 2020 and November 2020, when he was arrested,"

but Father "engaged in almost no services." Further, a parent is entitled to no relief based on the purported inadequacy of reunification services unless the parent timely objected to those services and gave DCS an opportunity to cure any deficiencies. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178, ¶ 13 (App. 2014). Father admitted in his testimony that he never objected to the adequacy of services before his incarceration. Any purported inadequacy in the services offered to Father before his imprisonment, therefore, is not a basis for relief. *See id.*

**¶35**        Once he was incarcerated, DCS's ability to offer him services was limited. Nevertheless, DCS continued providing Father with weekly virtual visitation and encouraged him to complete a parenting skills curriculum. Additionally, DCS requested that Father engage in the variety of programs offered to inmates by the Department of Corrections to address such issues as domestic violence and mental health. Father admitted that he did not participate in any of those services. The record supports the juvenile court's finding that DCS provided "an array of reunification services" which, if "successfully completed," would "likely" have resulted in reunification had Father not "committed the crimes for which he is currently incarcerated." Therefore, the court did not abuse its discretion by determining that DCS "made reasonable and diligent efforts to provide reunification services."

**¶36**        Father complains that "DCS would not allow [him] to . . . send letters" to the children. Nothing in the record supports this assertion. On the contrary, Father testified at trial that he did, in fact, send letters to the children. Because Father never raised this argument at trial, we will not consider it for the first time on appeal. *See In re MH 2008-002659*, 224 Ariz. 25, 27, ¶ 9 (App. 2010) (noting that appellate courts generally do not consider arguments not raised at trial).

**¶37**        Father does not expressly challenge the juvenile court's determination that terminating his relationship with the children would be in their best interests. In any event, the record supports the juvenile court's determination that the nature of the crimes of which Father has been convicted establish that he "is unable to safely interact with children."

**¶38**        Father appears to argue that his rights cannot legally be terminated because Mother's rights have not been. Because DCS initiated these proceedings against "both Mom and Dad but only [severed] Father's rights," he contends, "the case should [either] be dismiss[ed]" or "reunification" should be the case plan for "both" parents. Father cites no authority for this proposition. We reject, as both unsupported and illogical,

Father's contention that one parent's rights to a child cannot be terminated unless the other parent's rights are terminated also.

¶39        Father makes a number of other assertions that are not supported by the record. Father argues, for example, that he "has never done drugs" even though he tested positive for methamphetamine a month after the children were removed from his care. In any case, Father's denial of drug use, even if true, would provide no basis for challenging the termination order. DCS did not allege substance abuse under A.R.S. § 8-533(B)(3) as a ground for termination, nor did the juvenile court base its termination order on that statutory ground.

¶40        Father also argues that DCS never obtained "any court orders to legally remove [his] kids from [his] home." Because the temporary custody orders are part of the court file, we reject as baseless Father's claim that the orders were never issued. Father's other unsubstantiated accusations include that the children's maternal grandmother "is and was paying off the judges and DCS workers," that the children's placement "is doing sexual thing[s]" to them, and that the court terminated his parental rights based on "prejudice" against him for "being Jewish." No evidence in the record supports any of these accusations, which we therefore disregard. *See Flood Control Dist. of Maricopa Cnty. v. Conlin*, 148 Ariz. 66, 68 (App. 1985).

¶41        The undisputed evidence shows that Father will be incarcerated for decades for (1) possessing sexually explicit images of a young child he identified as his daughter and (2) shooting a baby and then intentionally delaying seeking medical attention for her. The nature of these offenses, and the length of his incarceration, support the juvenile court's determination that he will never be able to safely and appropriately act as a parent to any child. Because the evidence is sufficient to support the court's finding that DCS had made the requisite showing of grounds for termination and that termination would be in the children's best interests, we affirm the order terminating Father's parental rights to Mary and Mia.

**CONCLUSION**

¶42      We affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AGFV